**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GREGORY CAPUTO, Relator; Ex Rel. United States of America; GLOBAL TUNGSTEN & POWDERS CORPORATION, Relator; Ex Rel. United States of America,

*Plaintiffs-Appellees*,

v.

TUNGSTEN HEAVY POWDER, INC., DBA Tungsten Heavy Powder and Parts, Inc.,

*Defendant-Appellant*,

GREGORY A. VEGA; RICARDO ARIAS; MEGAN OVERMANN GOETZ; MARINA A. TORRES; THOMAS RUBINSKY; DONALD HAGANS,

*Real Parties in Interest*,

No. 22-55142

D.C. No. 3:18-cv-02352-W-AHG

ORDER

and

UNITED STATES OF AMERICA, Ex
Rel.,

*Real Party in Interest.*

Filed March 14, 2024

Before:  Marsha S. Berzon, Ryan D. Nelson, and Bridget S.
Bade, Circuit Judges.

Order

## SUMMARY[*]

### Sanctions

In an appeal by Tungsten Heavy Powder, Inc., from the
district court's award of attorneys' fees, the panel
(1) adopted, with some points of clarification, a special
master's factual findings, (2) adopted in full the special
master's conclusions of law and recommended sanctions and
disciplinary actions, and (3) imposed sanctions and
disciplinary actions, pursuant to Tungsten Heavy Powder's
stipulation and 28 U.S.C. § 1927, on Tungsten Heavy
Powder and attorneys Gregory A. Vega, Ricardo Arias, and

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

Donald Hagens for misconduct and unreasonable and vexatious multiplication of proceedings.

---

**COUNSEL**

Marina A. Torres (argued), Halpern May Ybarra Gelberg LLP, Los Angeles, California; Ethan J. Brown and Tom Rickeman, Brown Neri Smith & Khan LLP, Los Angeles, California; for Defendant-Appellant.

Jessica H. Sanderson (argued) and Sam D. Finkelstein, Volkov Law Group PC, Washington, D.C., for Plaintiffs-Appellees.

Patrick Q. Hall, Law Office of Patrick Q. Hall, San Diego, California, for Real-Parties-in-Interest Gregory A. Vega and Ricardo Arias.

Christopher A. Wright, Carney Badley Spellman PS, Seattle, Washington, for-Real-Party-in-Interest Megan Overmann Goetz.

Alex M. Weingarten, Willkie Farr & Gallagher LLP, Los Angeles, California, for Real-Party-in-Interest, Marina A. Torres.

Joseph J. Ybarra, Halpern May Ybarra Gelberg LLP, Los Angeles, California, for Real-Party-in-Interest Thomas Rubinsky.

Donald Hagans, Pro Se, Las Vegas, Nevada, for Real-Party-in-Interest Donald Hagans.

**ORDER**

Petitioners Global Tungsten & Powders Corp. (GTP) and Gregory Caputo have filed a motion for sanctions against respondent Tungsten Heavy Powder, Inc. (THP), alleging that THP filed its appeal in bad faith to delay payment of an attorneys' fee award entered by the District Court for the Southern District of California. The motion alleges that THP misrepresented to this court when it learned of "new evidence" underlying its application for reconsideration of the fee order, the denial of which was the subject of this appeal. THP represented that on October 29, 2021, Dennis Omanoff, a former employee of THP's corporate affiliate Tungsten Parts Wyoming, Inc. (TPW), "came forward alleging unethical and illegal conduct" by GTP's counsel. Based in part on a January 27, 2023, filing in Wyoming district court revealing that Omanoff began cooperating with THP in May 2021, GTP and Caputo contend that THP falsely represented that it could not have discovered with due diligence the evidence presented by Omanoff before October 29, 2021.

On March 30, 2023, this panel appointed Judge Richard C. Tallman of our Court as Special Master under Rule 48 of the Federal Rules of Appellate Procedure "to conduct any proceedings he deems appropriate to determine the scope of any misconduct, including knowing misrepresentations to the district court and this court, pertaining to the Omanoff affidavit, Appellant's application for reconsideration, and this appeal." After briefing by the parties, the production of more documents, a three-day evidentiary hearing, and closing arguments, Judge Tallman submitted his Report and Recommendation (R&R). That Report, attached to this Order, fully recounts the relevant factual background.

Gregory A. Vega, Ricardo Arias, Donald Hagans, and THP filed objections.

We adopt Judge Tallman's factual findings except for the following points of clarification:

1.   In Part II.A, the Report states: "In substance, TPW has absorbed all of THP's operations and assumed its liabilities. Today, the two companies are basically indistinguishable." R&R at 11. To the extent that this statement can be read as implying, as THP maintains in its objections, that the two companies are not legally separate, we decline to adopt that finding. Testimony indicates that THP remains legally separate from TPW. And we do not rely on the functional or operational coordination between the two companies in entering our sanctions order.

2.   In Part II.F.1, the Report states:

> Accordingly, the Special Master finds that based on the entirety of the evidence, Vega and Arias never communicated a belief that an appeal would lack merit to Hagans in the weeks between Judge Whelan's order denying their motion for reconsideration and the appeal to the Ninth Circuit. Nor did they say that to Marina A. Torres. The lack of contemporaneous documentation serves as evidence suggesting that they may never have harbored these reservations at all. Instead, the Special Master finds that the reason they did not take the appeal was simply based on the fact that neither Vega nor Arias had appellate experience and felt their

time was better spent continuing to represent
THP in the ongoing criminal investigation.

R&R at 37. Vega and Arias have objected to this factual
finding. We neither adopt nor disavow Judge Tallman's
findings about whether Vega and Arias advised Hagans of
the appeal's merit. Instead, we conclude that the
recommended sanctions against Vega and Arias under
§ 1927, and the recommended discipline of Vega under Rule
46(c) of the Federal Rules of Appellate Procedure, are
adequately supported, whether or not this factual finding is
supported by the record.

Judge Tallman did not rely on the alleged failure to
advise Hagans on the merits of the appeal in imposing
sanctions against Vega and Arias under § 1927. Instead, he
pointed to Arias's failure to conduct diligent research and his
decision to "recycle" an earlier draft of the motion for
reconsideration that referred to the May 24, 2021, affidavit
by substituting the October 29, 2021, date; Vega's
inadequate supervision of Arias and failure independently to
assess the legal and factual basis of the Rule 60 argument;
and both parties' failure to correct misstatements of law and
fact filed in the district court and with the Special Master.
R&R at 79–81. The Report and Recommendation identified
Vega's failure to advise Hagans as one factor supporting
individual discipline against Vega under Rule 46(c). But
Vega's failure to provide relevant information to Marina
Torres concerning his knowledge of the earlier draft
affidavits and his submission of a declaration to the Special
Master falsely stating that his firm had no role in preparing
the Omanoff affidavit were independently adequate to
support the recommended discipline. *Id.* at 89–91.

3.   Finally, in Part III.A.2, the Special Master concluded that "although Marina A. Torres personally submitted frivolous arguments to the Ninth Circuit and Special Master, she did not act with the requisite bad faith—i.e., recklessness—necessary to justify monetary sanctions under § 1927." *Id.* at 83. We agree with the Special Master's overall recommendation not to impose sanctions on Attorney Torres under either § 1927 or Rule 46. Still, added exposition of Torres's conduct is warranted.

Contrary to the Special Master's conclusion, Torres's behavior went beyond simply "allow[ing] her name to be placed on briefs that presented frivolous arguments on appeal." *Id.* at 84. As the attorney primarily responsible for researching and drafting the appellate briefs, the petition for rehearing, and the response to the motion for sanctions, Torres had the opportunity to verify the factual basis of THP's application for reconsideration and failed to do so. Her efforts to solicit information from Hagans, Vega, and Arias about their interactions with Omanoff were cursory. Further, by the time she filed the Opening Brief in this appeal, Torres recognized that the district court's denial of the application for reconsideration depended on an affidavit filed in the District of Wyoming but failed to thoroughly familiarize herself with that litigation. Even acknowledging that Vega, Arias, and Hagans withheld critical information from Torres concerning the extent of Omanoff's cooperation with THP, Torres likely could have uncovered the omission by reviewing the Wyoming pleadings and THP's district court briefs more thoroughly.

Most troubling are Torres's representations in THP's response to the motion for sanctions. That document states: "In its Motion for Reconsideration, when Defendant first represented that Omanoff 'came forward alleging unethical

and illegal conduct by [GTP's counsel] related to Case No. 3:18-cv-02352-W-AHG' on October 29, 2021, Defendant was only referring to the date the affidavit was signed and executed—not the date that Omanoff first approached TPW." The response further represents that "In all of its filings, Defendant has, very clearly and repeatedly, said that the 'new evidence' was Omanoff's signed and sworn [October 29, 2021] affidavit."

Those representations do not accurately characterize THP's filings. For example, the application for reconsideration stated that "*new evidence brought to light* by Dennis Omanoff . . . show[ed GTP's counsel] was involved in unethical and possible illegal conduct," while the attached memorandum of points and authorities stated that Omanoff "*came forward* alleging unethical and illegal conduct," language that suggests the information shared through Omanoff's cooperation with THP was the "new evidence," rather than the production of a particular document. THP's opening brief on appeal—drafted by Torres—stated that Omanoff's "*testimony* did not come to light until the day he came forward and [the] day the [October 29th] affidavit was signed," and that "THP was not aware of Omanoff's *knowledge* prior to October 29, 2021." Those statements acknowledge a distinction between the affidavit and the information, testimony, or knowledge it contained, but inaccurately represent that the information, testimony, or knowledge—not just the affidavit—first came into THP's hands when the October 29, 2021, affidavit was signed.

The reply brief similarly claimed that "[i]t was only after Omanoff came forward with his affidavit that evidence of Plaintiffs' illegal and fraudulent conduct . . . was discovered," (falsely) suggesting that THP did not know of the *misconduct* before the date the October 29 affidavit was

signed. And finally, THP's petition for rehearing argued that it "had not previously been aware of the new *evidence*—the evidence detailed in Omanoff's affidavit—until two days after the [attorneys' fee] order was signed." "The evidence detailed in Omanoff's affidavit" and the affidavit itself are not the same. Contrary to Torres's representations in the response to the sanctions motion, therefore, THP's claimed "new evidence" did not refer exclusively to the affidavit itself but referred also to the information the affidavit contained.

In sum, despite the district court and this panel's statements that THP had access to most of the "new" evidence relied on in the application for reconsideration for some time before the fee order was issued, Torres "quadrupled down" on the claim that THP had discovered the new evidence only after the fee award was final. R&R at 48. And after it became clear that Omanoff had begun cooperating with THP far earlier than the signing of the October affidavit, Torres attempted to narrow THP's "new evidence" argument to refer only to the affidavit itself, contravening the far more plausible interpretation that "new evidence" referred to the *information* contained within the affidavit that may have supported reconsideration of the fee award. That is, Torres repeated and further refined THP's claims in the face of multiple decisions and motions by the petitioners highlighting its implausibility.

At the same time, Torres was relatively less culpable than Hagans, Vega, and Arias, as she had not known, as they did, that there was an earlier, signed Omanoff declaration. Her errors were largely—but not only—of omission, not commission. Accordingly, while we believe that Torres ought to have exercised considerably greater care both in investigating Omanoff's involvement and in making

representations in the appellate and motion for sanctions briefs, her conduct does not rise to the level of "bad faith" necessary to impose sanctions under § 1927. Nor are sanctions warranted under Rule 46.

Having clarified those factual points, and having carefully considered the Report and Recommendation, we overrule the objections filed by Gregory A. Vega, Ricardo Arias, Donald Hagans, and THP, except as noted above. We grant Petitioners' motion for sanctions. And we adopt in full Judge Tallman's conclusions of law and the following recommended sanctions and disciplinary actions:

THP is liable for $246,983.68. Donald Hagans is jointly and severally liable with THP for up to 50% of the above amount, not to exceed $123,491.84. Gregory A. Vega is jointly and severally liable with THP for up to 20% of the above amount, not to exceed $49,396.74. Ricardo Arias is jointly and severally liable with THP for up to 10% of the above amount, not to exceed $24,698.37.

Gregory A. Vega is publicly reprimanded under Rule 46(c).

The State Bar of Texas shall receive from the Clerk of Court a copy of the attached Report and Recommendation for consideration of any further discipline they deem appropriate with respect to the conduct of Donald Hagans.

The State Bar of California shall receive from the Clerk of Court a copy of the attached Report and Recommendation for consideration of any further discipline they deem appropriate with respect to the conduct of Gregory A. Vega and Ricardo Arias.

The United States District Court for the Southern District of California shall receive from the Clerk of Court a copy of

the attached Report and Recommendation for consideration of any further discipline they deem appropriate with respect to the conduct of Gregory A. Vega and Ricardo Arias.

The United States District Court for the District of Wyoming shall receive from the Clerk of Court a copy of the attached Report and Recommendation for consideration of any further discipline they deem appropriate with respect to the conduct of Megan Overmann Goetz.

**SO ORDERED.**

# APPENDIX

**FILED**

OCT 31 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: TUNGSTEN HEAVY POWDER SPECIAL MASTER PROCEEDING, _____ GREGORY CAPUTO, Relator; et al., Petitioners, v. TUNGSTEN HEAVY POWDER, INC., DBA Tungsten Heavy Powder and Parts, Inc., Respondent, GREGORY A. VEGA; et al., Real Parties in Interest. | No.  23-80039 No.  22-55142 D.C. No. 3:18-cv-02352-W-AHG Southern District of California, San Diego REPORT AND RECOMMENDATION OF THE SPECIAL MASTER |

Before:  RICHARD C. TALLMAN, Circuit Judge, acting as Special Master.

The Special Master herewith submits his Report and Recommendation pursuant to the panel's instructions.

## TABLE OF CONTENTS

I. INTRODUCTION & BACKGROUND ................................................................3
II. FINDINGS OF FACT ...................................................................................10
   A.   The Corporate Parties..............................................................................10
   B.   Litigation History Between GTP and THP ..............................................12
   C.   Developments in May and June 2021 ......................................................17
   D.   Developments in October and November 2021 ........................................24
   E.   Judge Whelan's Decision on the Application for Reconsideration ...........29
   F.   THP's Appeal to the Ninth Circuit...........................................................32
      1.  *Seltzer Caplan's Decision Not to Handle the Appeal*...........................32
      2.  *THP's Initial Appeal to the Ninth Circuit*............................................37
      3.  *THP's Petition for Panel Rehearing*......................................................41
   G.   GTP's Motion for Sanctions and the Appointment of the Special Master .43
   H.   Relevant Developments in the Wyoming Antitrust Litigation ...................49
   I.   Special Master Proceedings .....................................................................51
      1.  *THP's Opening Brief and Supporting Declarations* .............................53
      2.  *THP's Request to Correct Its Opening Brief* .......................................58
III. CONCLUSIONS OF LAW ........................................................................61
   A.   Monetary Sanctions.................................................................................61
      1.  *Sanctions Pursuant to THP's Stipulation* ............................................62
         a) *Costs and Fees from the District Court Proceedings*......................64
         b) *Costs and Fees from the Ninth Circuit Proceedings* .......................66
         c) *Costs and Fees Resulting from Petitioners' Motion for Sanctions*
            *and the Special Master Proceedings* ...............................................68
         d) *Reasonableness of the Various Calculations* ..................................70
      2.  *Individual Attorney Sanctions for the Unreasonable and Vexatious*
         *Multiplication of Proceedings* .............................................................74
   B.   Individual Attorney Discipline .................................................................86
      1.  *Gregory A. Vega and Marina A. Torres* ...............................................87
      2.  *Donald Hagans, Ricardo Arias, and Megan Overmann Goetz*.............95
IV. SUMMARY OF RECOMMENDATIONS ..................................................98

## I. INTRODUCTION & BACKGROUND

On November 24, 2021, Respondent Tungsten Heavy Powders, Inc. ("THP") filed an *ex parte* application for reconsideration of an October 28, 2021, attorneys' fees award granted by Judge Thomas J. Whelan in the Southern District of California. **Evid. Hr'g Ex. 300.** Judge Whelan granted the award in favor of Petitioners Gregory Caputo and Global Tungsten & Powders Corporation (collectively, "Petitioners") in a *qui tam* action brought by Petitioners against THP and settled in April 2021 for $5.6 million after the United States intervened. **S.D. Cal. Case No. 3:18-cv-02352-W-AHG, ECF No. 32.**

In support of its application, THP submitted an affidavit of Dennis Omanoff executed on October 29, 2021. **Evid. Hr'g Ex. 106.** The same affidavit had been originally filed by THP's affiliate, Tungsten Parts Wyoming, Inc. ("TPW"), in related antitrust litigation in the District of Wyoming, pending before Judge Alan B. Johnson. **D. Wyo. Case No. 2:21-cv-00099-ABJ, ECF No. 51-2.** Affiant Omanoff[1] averred, among other things, that Petitioners and their *qui tam* counsel had engaged in unethical, illegal, and anticompetitive conduct toward THP and TPW by

---

[1] At the time his affidavit was filed, Dennis Omanoff was a former employee of TPW and defending himself against TPW's claims in the related Wyoming litigation. ***See* Ninth Cir. Case No. 23-80039, ECF Nos. 8-2, 22-4.** Strangely, although Omanoff remains a nominal defendant in the Wyoming litigation, he has since been rehired effective January 1, 2023, as TPW's CEO. *Id.*

orchestrating corporate espionage to pilfer documents in aid of the *qui tam* action. **Evid. Hr'g Ex. 106.**

In its *ex parte* application for reconsideration, THP argued that it was entitled to relief from the attorneys' fees award under Fed. R. Civ. P. 60(b)(2) because the Omanoff affidavit, first filed in the District of Wyoming antitrust case, contained "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for" relief under Fed. R. Civ. P. 59(b). **Evid. Hr'g Ex. 300, at 2.** Judge Whelan denied relief, finding that "[m]ost of the evidence was known to [Respondent] since at least May or June 2021." **Evid. Hr'g Ex. 101, at 2.**

On appeal to the Ninth Circuit, Respondent again asserted that it "was not aware of Omanoff's knowledge prior to October 29, 2021" because "Omanoff only came forward after [Judge Whelan's] order had already been signed." **Evid. Hr'g Ex. 211, at 37.** A Ninth Circuit panel consisting of U.S. Circuit Judges Marsha S. Berzon, Ryan D. Nelson, and Bridget S. Bade affirmed the district court in a memorandum disposition. **Ninth Cir. Case No. 22-55142, ECF No. 36.** Respondent then filed a petition for panel rehearing, renewing its argument that "Omanoff's testimony did not come to light until the day . . . the affidavit was signed" and that "no amount of due diligence would have uncovered" the information contained in the affidavit. **Evid. Hr'g Ex. 105, at 87.** The panel denied

the petition for rehearing on January 30, 2023. **Ninth Cir. Case No. 22-55142, ECF No. 41.**

On February 13, 2023, after the mandate had issued, Petitioners filed a motion for sanctions against Respondent with the Ninth Circuit panel. **Ninth Cir. Case No. 22-55142, ECF No. 43.** The motion referenced a new filing that TPW had submitted in the related Wyoming litigation, which implied that Respondent THP had been aware of Omanoff's information as early as May 2021. *Id.* **(referencing D. Wyo. Case No. 2:21-cv-00099-ABJ, ECF No. 135).** On the basis of that motion, and finding that these developments presented "significant factual issues that warrant[ed] further proceedings," the Ninth Circuit panel appointed the undersigned as Special Master under Fed. R. App. P. 48 and charged the Special Master with determining "the scope of any misconduct, including knowing misrepresentations" that were made to the San Diego district court and the Ninth Circuit. **Ninth Cir. Case No. 23-80039, ECF No. 1.**

In its first filing before the Special Master, THP maintained that Omanoff's October "affidavit detailed, for the first time" his various allegations. **Ninth Cir. Case No. 22-55142, ECF No. 54, at 5.** However, in its June 12, 2023, opening brief to the Special Master, THP revealed for the first time to any court that Omanoff had prepared a draft of his affidavit for TPW in May 2021, but the draft "was shelved and not filed" and critically "was not provided to THP's counsel in the *qui tam* case."

**Evid. Hr'g Ex. 217, at 6.** Accordingly, Respondent THP renewed its assertion that its San Diego *qui tam* defense counsel, as opposed to TPW's Wyoming antitrust counsel, "had no knowledge of the information in Mr. Omanoff's declaration, or that Mr. Omanoff was even preparing a declaration" prior to its October 29, 2021, date of execution and filing in Wyoming. *Id.* **at 1.** Respondent submitted supporting declarations of various counsel and another from Omanoff to "corroborate" this assertion. *Id.* **at 4–12.**

On June 22, 2023, ten days after filing its opening brief with the Special Master, THP filed a request for leave to correct that brief. **Evid. Hr'g Ex. 221.** THP now explained that it had "discovered that certain statements in [its] Opening Brief [were] not accurate." *Id.* **at 1.** Namely, THP's newly engaged counsel for these proceedings, Ethan J. Brown, Esq. of the law firm Brown, Neri, Smith & Khan LLP, reported that he had "learned for the first time that the May 2021 affidavit by Dennis Omanoff referenced in the Opening Brief was transmitted to THP's *qui tam* counsel in late May 2021." *Id.* Respondent contemporaneously submitted a corrected brief with minor edits but did not correct the declarations it had filed to corroborate its previous false assertion that THP's San Diego *qui tam* counsel, Gregory A. Vega

and Ricardo Arias from the law firm Seltzer Caplan McMahon Vitek,[2] had never received a copy of any May 2021 affidavits.

In response to this admission, the Special Master ordered the production of any May 2021 draft of the Omanoff affidavit and ordered THP's counsel to submit a declaration explaining the precise details behind the creation and transmittal of the May 2021 draft to THP's *qui tam* counsel. **Ninth Cir. Case No. 23-80039, ECF No. 18.**

On July 19, 2023, THP produced documents, numerous draft affidavits, and declarations pursuant to the Special Master's order. **Ninth Cir. Case No. 23-80039, ECF No. 22.** The documents produced revealed that: (1) at all relevant times THP and TPW shared corporate counsel, Donald Hagans, Esq.; (2) Hagans met with Omanoff in May 2021 in Florida and the two drafted several affidavits and declarations; (3) four of these drafts included the California *qui tam* caption and listed THP's San Diego counsel in that matter, Gregory A. Vega and Ricardo Arias; (4) Omanoff signed several of these drafts, including one for filing in Wyoming, and one for potential filing in the California *qui tam* action; and (5) Hagans contemporaneously transmitted the signed declarations to Vega and Arias. ***See id.***

---

[2] At all times relevant to these proceedings, Gregory A. Vega was the supervising partner at Seltzer Caplan McMahon Vitek, and Ricardo Arias was the associate working on the case. In 2021, Ricardo Arias was a third-year associate with the firm, having been admitted to practice law in 2018. ***See* Evid. Hr'g Tr. vol. 2, 540–41 (Testimony of Ricardo Arias).**

These productions directly contradicted THP's repeated assertions that the October 29, 2021, Omanoff affidavit filed by TPW in the related Wyoming litigation contained new evidence that THP could not have discovered earlier with the exercise of reasonable diligence.

Acknowledging the gravity of these disclosures, Respondent THP commendably offered to stipulate to the entry of the requested sanctions award. *Id.* **at 2; Ninth Cir. Case No. 23-80039, ECF No. 32, at 13–14.** However, due to the complex web of misrepresentations made by different counsel to various courts, including the Special Master, questions remained as to whether counsel acting on THP's behalf did so knowingly and in bad faith, recklessly, or were unwittingly induced by THP to submit the misrepresentations. Mindful that the Ninth Circuit panel had charged the Special Master with determining "the *scope* of any misconduct, including *knowing* misrepresentations to the district court and [the Ninth Circuit]," **Ninth Cir. Case No. 22-55142, ECF No. 48, at 4 (emphasis added)**, the Special Master determined that an evidentiary hearing was necessary to fulfill the panel's mandate and to provide those involved with a full and fair opportunity to be heard as to whether sanctions are warranted against individual attorneys in addition to Respondent THP.

Accordingly, the Special Master ordered Respondent THP, corporate counsel Donald Hagans, and several of its outside counsel to show cause as to why sanctions

should not be imposed on them for the numerous misrepresentations they caused to be filed in various courts.[3]  **Ninth Cir. Case No. 23-80039, ECF No. 31.**

The Special Master heard testimony and received documentary evidence over the course of a three-day hearing from August 8–10, 2023, followed by another half day of closing arguments on September 18, 2023, after a certified transcript of the evidentiary hearing had been supplied by court reporter Ronelle Corbey.  *See* **Ninth Cir. Case No. 23-80039, ECF No. 83.**  Nine witnesses testified under oath and sixty-six exhibits were admitted into evidence.  The Special Master also received and reviewed *in camera* thousands of pages of documents submitted in advance by the parties for review to resolve assertions of attorney-client privilege and the work product doctrine.

---

[3] Outside counsel ordered to show cause were Megan Overmann Goetz, Esq. of Pence and MacMillan LLC (Laramie, Wyoming); Gregory A. Vega, Esq. and Ricardo Arias, Esq. of Seltzer Caplan McMahon Vitek; Marina A. Torres, Esq., formerly of Halpern May Ybarra Geldberg LLP, now of Willkie Farr & Gallagher LLP; Thomas Rubinsky, Esq. of Halpern May Ybarra Gelberg LLP; and Donald Hagans, Esq., a solo practitioner who offices in Las Vegas, Nevada.

## II. FINDINGS OF FACT[4]

### A.    The Corporate Parties

Tungsten is a naturally occurring rare metal with exceptional hardness and a very high melting point.  These characteristics combine to make tungsten products crucial to our national security and defense interests due to its usefulness in bullets, projectiles, and other armor-piercing munitions.  *See* **Cong. Rsch. Serv.,** *Defense Primer: Acquiring Special Metals, Rare Earth Magnets, and Tungsten* **(Updated Jan. 30, 2020).**  However, tungsten, which is mined and sold in powder form, must go through a rigorous manufacturing process before it is viable for military or commercial use.  *See, e.g.*, *Tungsten Manufacturing Operations*, **Tungsten Parts Wyoming, https://tungstenparts.com/tungsten-manufacturing-operations/ (last visited Oct. 27, 2023).**

Tungsten Heavy Powders, Inc. was founded as a trading company in the late 1990's to import tungsten powder from China for distribution in the United States. **Evid. Hr'g Tr. vol. 1, 88 (Testimony of Russell Lewis).**  THP eventually considered expanding into the manufacturing of tungsten products, which led to the development of a factory in Wyoming and the birth in 2018 of a sister company,

---

[4] To the extent findings of fact are more appropriately categorized as conclusions of law, or vice versa, each is to be treated as if set forth under the category deemed appropriate.  *See Tri-Tron Int'l v. A.A. Velto*, **525 F.2d 432, 435–36 (9th Cir. 1975).**

Tungsten Parts Wyoming. *Id.* **at 89, 163.** TPW developed a process of pressing, debinding, and sintering tungsten powder to create solid products that it could distribute to prime defense contractors for incorporation into weapons systems. *Id.* While TPW began by processing tungsten powder on behalf of THP, it ultimately received its own license to distribute tungsten products to these contractors. *Id.* **at 89.**

THP was owned by Russell Lewis and Joseph Sery (a.k.a. "Serov"). *Id.* **at 88.** Lewis was the financier whereas Sery served as managing partner and played a more active role in overseeing the company's daily operations. *Id.* While THP still exists as a corporate entity, the business is now defunct and ceased primary operations in 2019. *Id.* **at 114, 164.** Lewis is the company's only current officer and director. *Id.* **at 113–14.** In substance, TPW has absorbed all of THP's operations and assumed its liabilities. Today, the two companies are basically indistinguishable.

THP and TPW's major competitor is Global Tungsten & Powders Corporation ("GTP"), and the two companies (with a combined market share of 90%) have been locked in a bitter war for market dominance. *See* **Evid Hr'g Ex. 106, at ¶ 16.** These proceedings are just the latest skirmish.

### B. Litigation History Between GTP and THP

Understanding the complex litigation history between THP/TPW and GTP that led up to these proceedings is crucial to understanding who knew what, when.

In October 2017, THP filed a defamation action against GTP in the Middle District of Pennsylvania ("Pennsylvania Defamation Litigation"). **M.D. Penn. Case No. 4:17-cv-01948-MWB, ECF No. 1.** THP alleged that GTP was spreading false and defamatory statements that THP was importing raw materials from China and having those materials inspected in Mexico as opposed to sourcing from approved countries and inspecting and processing those materials domestically as required by federal procurement rules and statutes. **M.D. Penn. Case No. 4:17-cv-01948-MWB, ECF No. 13, at 6.** The parties resolved the Pennsylvania litigation in October 2019 with a sealed settlement agreement, *see* **M.D. Penn. Case No. 4:17-cv-01948-MWB, ECF No. 73**, that included a broad written release and waiver of all known and unknown claims, *see* **D. Wyo. Case No. 2:21-cv-00099-ABJ, ECF No. 75, at 3–4 (acknowledging breadth of release language).**

Notwithstanding the settlement of the Pennsylvania Defamation Litigation, Respondent THP was in fact misrepresenting the origin of its materials sold to prime defense contractors. **Evid. Hr'g Tr. vol. 3, 772 (Testimony of Donald Hagans).**

Accordingly, Petitioners GTP and Gregory Caputo[5] initiated this litigation in October 2018 by filing a sealed False Claims Act *qui tam* complaint in the Southern District of California ("California *Qui Tam* Litigation"). **S.D. Cal. Case No. 3:18-cv-02352-W-AHG, ECF No. 1.** Petitioners (called "*qui tam relators*" in False Claims Act parlance), represented by the Volkov Law Group, alleged THP had falsely certified that its tungsten had been sourced from approved places when it had actually been sourced from China. ***Id.*** Petitioners also alleged that THP was fraudulently testing and certifying the quality of those materials. ***Id.***

In April 2019, TPW hired Dennis Omanoff as CEO to develop and establish manufacturing operations at TPW's new Wyoming factory. **Evid. Hr'g Ex. 116, at ¶ 4; Evid. Hr'g Tr. vol. 1, 170 (Testimony of Dennis Omanoff).** Sometime in May 2019 the complaint in the California *Qui Tam* Litigation was ordered unsealed and THP became aware that the United States Department of Justice ("DOJ") was now investigating the matter. **Evid. Hr'g Tr. vol. 1, 170–71 (Testimony of Dennis Omanoff).** According to Omanoff, it was around this time that he discovered Joe Sery was in fact causing false claims to be submitted to defense contractors as alleged in the California *Qui Tam* Litigation and was also illegally exporting defense-related technical data to restricted countries in violation of the International

---

[5] Gregory Caputo was a THP employee until 2017 when he left the company to work for GTP. **Evid. Hr'g Ex. 116, at ¶ 5.**

Traffic in Arms Regulations ("ITAR"), 48 C.F.R. § 227.675–1. *Id.*; *see also* **Press Release, U.S. Att'ys Off. S.D. Cal.,** *Former Tungsten Heavy Powder & Parts CEO Arrested and Charged with Unlawful Exportation of Defense Articles Including to The People's Republic of China* **(Mar. 4, 2022), available at https://www.justice.gov/usao-sdca/pr/former-tungsten-heavy-powder-parts-ceo-arrested-and-charged-unlawful-exportation.** Although Omanoff testified that he confronted Joe Sery with the information and that ultimately he and his staff felt compelled to resign in July 2019, other evidence suggests that Omanoff resigned merely for personal and financial reasons. *Compare* **Evid. Hr'g Tr. vol. 1, 171–72 (Testimony of Dennis Omanoff) (attributing Omanoff's resignation to the fact that he "became aware of some serious ITAR violations . . . by Joe Sery"),** *with* **Evid. Hr'g Ex. 1001 (indicating Omanoff resigned because "Joe [Sery] would not accede to additional investment . . . and was impossible to work with").**

Regardless of his motivations, Omanoff contacted the Volkov Law Group, counsel of record for Petitioners in the California *Qui Tam* Litigation, shortly after his resignation. **Evid. Hr'g Tr. vol. 1, 172 (Testimony of Dennis Omanoff).** On July 23, 2019, Omanoff engaged the Volkov Law Group for personal legal representation in connection with his reporting of the misconduct by Sery and THP. **D. Wyo. Case No. 2:21-cv-00099-ABJ, ECF No. 51-3.** The engagement letter drafted by the Volkov Law Group acknowledged the possibility that conflicts of

interest between Omanoff and GTP could arise, in part due to Omanoff's former employment with TPW. *Id.* Volkov had Omanoff waive any current or future conflicts. *Id.* The agreement also promised Omanoff a predetermined percentage of the relator award if his cooperation resulted in new or novel legal claims against THP in the California *Qui Tam* Litigation. *Id.*

On September 30, 2019, Omanoff executed a common interest agreement with GTP and others in which he agreed to cooperate in the DOJ investigation of THP and Sery, and to cooperate in a pending London arbitration against THP. **D. Wyo. Case No. 2:21-cv-00099-ABJ, ECF No. 51-4.**

Around this time, Lewis had Sery step down from his positions at THP and TPW, and Lewis became the majority owner of both entities. **Evid. Hr'g Tr. vol. 1, 88–89 (Testimony of Russell Lewis).** Lewis began playing a more active role in TPW's daily operations and winding down THP's operations and revenue stream.[6] Lewis also hired Donald Hagans, Esq., an attorney Lewis had worked with in relation to Lewis's other worldwide business interests, as "an outside lawyer" and "consultant" to handle THP and TPW's legal matters. **Id. at 89, 95–96.** Although

---

[6] THP presently has no revenue stream and exists only on paper to satisfy its financial obligations. *See* **Evid. Hr'g Tr. vol. 1, 113, 164 (Testimony of Russell Lewis); Evid. Hr'g Ex. 232, at ¶ 3**. For all intents and purposes, the company is moribund. TPW has stepped in to rebuild the business THP lost through its corporate misconduct and to demonstrate to the United States Department of Defense that it is a presently responsible government contractor for procurement of needed war material.

Lewis had final client approval authority with respect to major litigation decisions, he delegated the vast majority of this authority to Hagans's discretion. *Id.* at 95, 127–28. That included reviewing and approving all legal filings and legal bills submitted by outside counsel, though Lewis might be consulted to approve particularly large invoices. *Id.* The Special Master therefore finds that at all times relevant to these proceedings Donald Hagans was THP and TPW's *de facto* chief legal agent. In this role, he worked directly with Russell Lewis and was tasked with strategizing, coordinating, and orchestrating corporate litigation decisions while overseeing outside litigation counsel on behalf of both entities. *Id.*; **Evid. Hr'g Ex. 232; Evid. Hr'g Tr. vol. 3, 768, 784 (Testimony of Donald Hagans).**

On April 30, 2020, several former TPW employees, including Omanoff, filed suit in the District of Wyoming against both THP and TPW ("Wyoming Constructive Termination Litigation"). **D. Wyo. Case No. 2:20-cv-00073-ABJ, ECF No. 1.** The ex-employees alleged THP and TPW had defamed them and violated the False Claims Act's anti-retaliation provisions, which are designed to protect whistleblowers. *Id.* The parties went to mediation where Omanoff and Hagans became acquainted with each other, and the matter settled in August 2020. **D. Wyo. Case No. 2:20-cv-00073-ABJ, ECF Nos. 11, 15; Evid. Hr'g Tr. vol. 1, 173 (Testimony of Dennis Omanoff) (describing Hagans as a "voice of reason**

**and competency and ethics on the other side of the table" during the Wyoming Constructive Termination Litigation mediation).**

Back on the west coast, the United States intervened in the California *Qui Tam* Litigation to negotiate a resolution of the case, and THP settled the damages claim for $5.6 million on April 7, 2021. **S.D. Cal. Case No. 3:18-cv-02352-W-AHG, ECF Nos. 19–22.** However, THP did not agree on the amount it would pay for Relators' attorneys' fees. **S.D. Cal. Case No. 3:18-cv-02352-W-AHG, ECF No. 20.** On April 23, 2021, Petitioners moved for attorneys' fees on behalf of its legal representative, the Volkov Law Group, and THP filed its opposition brief on May 11, 2021. **S.D. Cal. Case No. 3:18-cv-02352-W-AHG, ECF Nos. 25, 30.** The battle over attorneys' fees in the California *Qui Tam* Litigation—which picked up significant steam in May 2021—is where our story begins in earnest.

### C.     Developments in May and June 2021

At some point during the pendency of the California *Qui Tam* Litigation, Hagans began to suspect that GTP and the Volkov Law Group had obtained the sensitive facts underlying the *qui tam* complaint through conduct constituting unlawful corporate espionage. *See* **Evid. Hr'g Tr. vol. 3, 775 (Testimony of Donald Hagans).** These suspicions underlie the original antitrust complaint filed by TPW on May 20, 2021, in the District of Wyoming against GTP, Omanoff, and several other former TPW employees ("Wyoming Antitrust Litigation"). **D. Wyo.**

**Case No. 2:21-cv-00099-ABJ, ECF No. 1.** The complaint alleged that GTP, by and through the Volkov Law Group, conspired with Omanoff and others to engage in corporate espionage and various other unlawful anticompetitive acts. *Id.* **at ¶¶ 35–37.**

Omanoff was served at his Florida residence with the summons and complaint in the Wyoming lawsuit on Friday, May 21, 2021. **Evid. Hr'g Tr. vol. 1, 191–92 (Testimony of Dennis Omanoff).** Within twenty-four to forty-eight hours of being served with the complaint, Omanoff called and left a message for TPW's then-CEO, J.P. Batache, indicating that he was willing to cooperate against the other named defendants. *Id.* **at 178, 192, 265.** The message was forwarded to Russell Lewis who returned the call. *Id.* **at 180.** Omanoff provided Lewis with information that tended to confirm some of the allegations contained in the Wyoming Antitrust Complaint. *Id.* Although suspicious of Omanoff's motives, Lewis informed Omanoff that Hagans would be in contact with him shortly by telephone. *Id.***; Evid. Hr'g Tr. vol. 1, 104–05 (Testimony of Russell Lewis).**

Hagans called Omanoff on Monday, May 24, 2021. **Evid. Hr'g Tr. vol. 2, 307–08 (Testimony of Dennis Omanoff); Evid. Hr'g Ex. 1001.** The call lasted between one and two hours and culminated in the two men deciding that it would be best for them to meet in person for Omanoff to share more detailed information about

GTP, Volkov, and what he perceived as "serious wrongs that were conducted against TPW." **Evid. Hr'g Tr. vol. 1, 182–83 (Testimony of Dennis Omanoff).**

On the morning of May 25, 2021, Hagans relayed via email detailed information he had learned about Omanoff's allegations against GTP and the Volkov Law Group ("Omanoff Allegations") to Respondent THP's California *qui tam* counsel Gregory A. Vega and Ricardo Arias, and Wyoming antitrust counsel Megan Overmann Goetz. **Evid. Hr'g Ex. 1001.** Hagans specifically emphasized that the Omanoff Allegations would have "implications on a number of fronts" and that he had already spoken about those implications with Ricardo Arias "re DOJ and Volkov fees," and Megan Overmann Goetz "re the WY case." *Id.* In the same email, Hagans informed Vega, Arias, and Goetz that he would be "getting affidavit(s)" from Omanoff in Florida in the following days and asked them for "any input on questions / answers that [they] believe[d] [would be] important and relevant." *Id.*

Immediately thereafter, Hagans flew to Florida. Over a two- to three-day period from May 26–28, 2021, Hagans and Omanoff met regarding the Omanoff Allegations. *Id.*; **Evid. Hr'g Tr. vol. 2, 308 (Testimony of Dennis Omanoff).** During their in-person meetings, the two men cooperatively drafted at least seven declarations and affidavits detailing the Omanoff Allegations for use in both the Wyoming Antitrust Litigation and California *Qui Tam* Litigation. *See* **Evid. Hr'g Exs. 112, 113, 225, 245, 302, 304, 315 (draft Omanoff affidavits); Evid. Hr'g Ex.**

**232, at ¶¶ 9–10 (Hagans declaration to the Special Master); Evid. Hr'g Tr. vol. 1, 186–88 (Testimony of Dennis Omanoff); Evid. Hr'g Tr. vol. 3, 805 (Testimony of Donald Hagans).**

At some point during the course of Hagans's meeting with Omanoff in Florida, Hagans contacted Megan Overmann Goetz—TPW's counsel in the Wyoming Antitrust Litigation—and asked her to copy the Omanoff Allegations that he had shared with her via email and to paste them into a template that included the case caption for the Wyoming matter. **Evid. Hr'g Tr. vol. 2, 321 (Testimony of Megan Overmann Goetz).** Goetz instructed either a legal assistant or associate at her firm to do so. *Id.* **at 322.** Eventually, Goetz sent back a draft affidavit to Hagans that was prepared on her firm's pleading paper and included the Wyoming case caption. *Id.* **at 323.** On Friday, May 28, 2021, Omanoff executed and notarized an affidavit on Goetz's firm's pleading paper for filing in the Wyoming Antitrust Litigation. **Evid. Hr'g Ex. 245.** According to an agreement between Omanoff and Hagans, Hagans was free to file notarized documents in court. *See* **Evid. Hr'g Tr. vol. 1, 248 (Testimony of Dennis Omanoff).**

However, based on the dates of the various drafts, it appears that preparing a declaration for use in the California *Qui Tam* Litigation was the first order of business. On May 27, 2021, the day before Omanoff signed and notarized the Wyoming affidavit, Omanoff executed various declarations on Seltzer Caplan

McMahon Vitek pleading paper, listing Gregory A. Vega and Ricardo Arias as attorneys, and including the California *Qui Tam* Litigation caption.[7] *See* **Evid. Hr'g Exs. 112, 304, 315.** The contents of these draft declarations evidence that they were intended to support an immediate attack by THP on Petitioners' pending attorneys' fee application in the California *Qui Tam* Litigation. *Id.*

Hagans transmitted the final, signed declaration to Vega and Arias, and Vega directed Arias to use it to begin preparing an *ex parte* application for relief from Petitioners' pending motion for costs and fees. **Evid. Hr'g Tr. vol. 2, 428–29 (Testimony of Gregory Vega); Evid. Hr'g Tr. vol. 2, 552–53 (Testimony of Ricardo Arias).** Around this same time in May 2021, Vega and Arias also received the signed and dated Omanoff affidavit prepared for the Wyoming litigation. **Evid. Hr'g Tr. vol. 2, 431–32 (Testimony of Gregory Vega).** Unlike the final California affidavit, which was four pages long, the final Wyoming affidavit was twelve pages long and included substantial additional allegations. *See* **Evid. Hr'g Exs. 245, 305.** The Special Master finds that, at the time Ricardo Arias began preparing the first draft of the *ex parte* application for relief in late May 2021, he had possession of the

---

[7] Both Gregory A. Vega and Ricardo Arias testified that they worked with Hagans in a similar fashion to Megan Overmann Goetz in that Hagans would transmit information to them and Arias would copy and paste the information onto their law firm's pleading paper and include the relevant case caption. *See* **Evid. Hr'g Tr. vol. 2, 421 (Testimony of Gregory Vega); Evid. Hr'g Tr. vol. 2, 545 (Testimony of Ricardo Arias).**

information included in both the May California affidavit and the longer May Wyoming affidavit. **Evid. Hr'g Tr. vol. 2, 431–32 (Testimony of Gregory Vega).**

At Vega's direction, Arias immediately prepared a draft of the *ex parte* application. **Evid. Hr'g Tr. vol. 2, 552 (Testimony of Ricardo Arias).** The draft application asserted that new evidence warranted an evidentiary hearing regarding the Petitioners' motion for attorneys' fees pending before Judge Whelan in the California *Qui Tam* Litigation because "[o]n *May 24, 2021*, THP learned that Dennis Omanoff . . . *came forward* alleging unethical conduct by Volkov." **Evid. Hr'g Ex. 308 (emphasis added).** At the time of this initial draft, the statements about when THP and its counsel learned that Dennis Omanoff came forward with "new evidence" were true. However, the draft *ex parte* application for relief and accompanying Omanoff declaration were shelved for over five months.

This delay was caused in part because Hagans, Vega, and Arias testified that, in May 2021, they still had some concerns regarding the veracity and accuracy of the Omanoff Allegations. **Evid. Hr'g Tr. vol. 2, 427–28, 431 (Testimony of Gregory Vega); Evid. Hr'g Tr. vol. 2, 605 (Testimony of Ricardo Arias); Evid. Hr'g Tr. vol. 3, 799, 806 (Testimony of Donald Hagans).** This testimony is supported by contemporaneous emails exchanged between Hagans, Vega, and Arias. *See* **Evid. Hr'g Ex. 1001.** However, Arias and Vega also testified that they shelved the May 2021 draft *ex parte* application in order to divert their firm's resources

toward defending against the DOJ's criminal investigation of THP, which was ramping up at this time. **Evid. Hr'g Tr. vol. 2, 433–34 (Testimony of Gregory Vega); Evid. Hr'g Tr. vol. 2, 553–54 (Testimony of Ricardo Arias).** Accordingly, the Special Master finds that Hagans, Vega, and Arias chose not to file the original draft *ex parte* application for an evidentiary hearing with Judge Whelan, or otherwise alert the San Diego district court to the Omanoff Allegations, in May 2021 for reasons that were primarily tactical in nature.

By the end of June 2021, however, Hagans was more confident in the reliability of Omanoff as an affiant and in the veracity of the Omanoff Allegations. Over the course of June 22 and June 23, 2021, Hagans again travelled to Omanoff's Florida home to reinterview him and verify the truth of the Omanoff Allegations by asking him to confirm the allegations contained in the First Amended Complaint to be filed in the Wyoming case. **Evid. Hr'g Tr. vol. 3, 807–08 (Testimony of Donald Hagans).**

On the basis of this second meeting, on June 25, 2021, Hagans directed Goetz to file the *verified* First Amended Complaint in the Wyoming Antitrust Litigation, now joining the Volkov Law Group as a defendant. **D. Wyo. Case No. 2:21-cv-00099-ABJ, ECF No. 11.** The verified First Amended Complaint contained detailed allegations, including direct quotes, from various iterations of Omanoff's Wyoming affidavits. ***See, e.g., id.* at ¶¶ 43(d), 43(f).** For example, the verified First Amended

Complaint references private conversations that Omanoff allegedly had with GTP-connected individuals, which were only later confirmed in Omanoff's October 2021 affidavit. *Compare id.* **at ¶ 46 (discussing misrepresentations regarding assisting the United States Attorney's office),** *with* **Evid. Hr'g Ex. 106, at ¶ 19(c)–(d) (same);** *compare also* **D. Wyo. Case No. 2:21-cv-00099-ABJ, ECF No. 11, at ¶ 51 (quoting a former GTP co-defendant as saying the parties could "make a lot of money in the process" of destroying TPW),** *with* **Evid. Hr'g Ex. 106, at ¶ 30 (same).** The Special Master therefore finds that Respondent THP and its San Diego *qui tam* counsel, through Hagans, possessed the Omanoff evidence relevant to Judge Whelan's determination of Petitioners' motion for attorneys' fees in late-May 2021 and were confident in the veracity of that evidence by at least late-June 2021.

D. **Developments in October and November 2021**

In the fall of 2021, all of the defendants in the Wyoming Antitrust Litigation, except for Omanoff and Alonso Martinez, filed motions to dismiss. During the week of October 25, 2021, Hagans met for a third time with Omanoff at his Florida home, this time to secure a new affidavit to use in defense of the various motions to dismiss. **Evid. Hr'g Tr. vol. 3, 808–09 (Testimony of Donald Hagans); Evid. Hr'g Tr. vol. 1, 205–07 (Testimony of Dennis Omanoff).** Omanoff executed and notarized a new affidavit under the Wyoming case caption, and on Goetz's pleading paper, on Friday, October 29, 2021. **Evid. Hr'g Ex. 106.** However, as indicated above, most,

if not all of the information included in the October affidavit was already known to Hagans, and therefore THP and TPW, by late June 2021. Indeed, Hagans testified that the "June document would . . . essentially[] show everything that we had." **Evid. Hr'g Tr. vol. 3, 810 (Testimony of Donald Hagans).** Megan Overmann Goetz filed the October Omanoff affidavit as an attachment to her opposition to Defendants' motions to dismiss with District Judge Alan Johnson in Wyoming the same day that it was executed, October 29, 2021. **D. Wyo. Case No. 2:21-cv-00099-ABJ, ECF No. 51-2.**

Meanwhile, on Wednesday, October 27, 2021, Judge Whelan issued his decision granting in part Petitioners' application for attorneys' fees in the California *Qui Tam* Litigation. **S.D. Cal. Case No. 3:18-cv-02352-W-AHG, ECF No. 32.** Vega and Arias immediately emailed Hagans to notify him of Judge Whelan's order. **Evid. Hr'g Tr. vol. 2, 440 (Testimony of Gregory Vega).**

On November 1, 2021, Hagans sent Vega and Arias the October 29, 2021, Omanoff affidavit that was filed in the Wyoming Antitrust Litigation just three days prior. **Evid. Hr'g Ex. 309.** In his email, Hagans indicated that he "[w]ant[ed] to fight" Judge Whelan's order and was willing to do "whatever it takes," including filing an appeal. *Id.* Hagans also indicated that Vega and Arias "may be able to claim further information came to our attention" because they had not yet presented any of the Omanoff Allegations to the San Diego district court. *Id.* **("We were**

**'light' in SD compared to Wyoming . . . on what was submitted.")** It thus appears that this email was the first time that Hagans, Vega, and Arias considered arguing to the San Diego district court that new evidence had come to light as a result of the October 29, 2021, Omanoff affidavit, despite the fact that all three of the attorneys knew virtually all of the pertinent information contained in the affidavit as early as May 2021 and no later than June 2021. **Evid. Hr'g Tr. vol. 2, 444 (Testimony of Gregory Vega) (admitting the October Omanoff affidavit was "substantially similar to the two declarations . . . received from Mr. Hagans back in . . . May 2021).** Within "a week or two" after Hagans sent the October affidavit, Hagans instructed Vega and Arias to begin preparing an application for reconsideration. *Id.* at 445.

Soon thereafter, Arias began working on a new *ex parte* application for reconsideration. The eventual motion as filed rested on arguments based on Fed. R. Civ. P. 60(b)(2), (3), and (6).[8] *See* **Evid. Hr'g Exs. 300, 301.** Arias testified that

---

[8] Fed. R. Civ. P. 60(b) (emphasis added) states in relevant part:

> Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (2) *newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)*; (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; . . . (6) any other reason that justifies relief.

he "researched motion for reconsideration and [Rule 60] came up and [he] added it to [the] brief." **Evid. Hr'g Tr. vol. 2, 558 (Testimony of Ricardo Arias).** Arias, shockingly, testified that he did no further research to support his inclusion of Rule 60(b)(2) in the draft motion. *Id.* He did not read a single case on the meaning of the rule. **Evid. Hr'g Tr. vol. 3, 613 (Testimony of Ricardo Arias).** He did not do any research on the meaning of "newly discovered evidence." **Evid. Hr'g Tr. vol. 2, 556, 569 (Testimony of Ricardo Arias).** Nor did he research what the rule meant by "reasonable diligence." *Id.* He simply read the rule and included it in the application. *Id.* And, evidently, he did not read the rule very closely. Despite the fact that Rule 60(b)(2) plainly covers "newly discovered evidence," Arias testified that when he included it as a basis for reconsideration he "wasn't thinking about newly discovered" but instead was solely focused on the fact that the October Omanoff affidavit was "evidence that the judge hadn't seen." *Id.* at 560.

Arias's testimony further established that he used the shelved May 2021 draft of the *ex parte* application as a starting point for the renewed November application. A comparison of the language of the two drafts sheds light on Arias's decisions in the creation of the November application. The May draft states: "On **May 24, 2021**, THP learned that Dennis Omanoff, a former employee of Tungsten Parts Wyoming, Inc.[] ("TPW") from approximately April 15, 2019, to July 15, 2019, **came forward** alleging unethical conduct by Volkov related to Case No. 3:18-cv-02352-W-AHG."

**Evid. Hr'g Ex. 308 (emphasis added).** The November Memorandum of Points and Authorities that was filed with the San Diego district court states: "On **October 29, 2021, after this Court issued its Order**, Dennis Omanoff ("Omanoff"), a former employee of Tungsten Parts Wyoming ("TPW")[] from approximately April 15, 2019, to July 15, 2019, **came forward** alleging unethical and illegal conduct by Volkov related to Case No. 3:18-cv-02352-W-AHG." **Evid. Hr'g Ex. 301 (emphasis added).**

THP's November application thus contained a significant misrepresentative change to the true date on which Dennis Omanoff actually "came forward." When questioned about the change, Arias admitted without explanation that, when he returned to the application for reconsideration six months after preparing an initial draft, he copied and pasted the sentence, left in the "came forward" language, "but changed the date from May 2021 to [October] 2021." *See id.*; **Evid. Hr'g Tr. vol. 3, 600–01 (Testimony of Ricardo Arias).**

Once Arias completed the November draft application for reconsideration, he sent it to Vega for approval. Like Arias, Vega did not conduct any legal research on the meaning of Fed. R. Civ. P. 60(b)(2) beyond reading its text. **Evid. Hr'g Tr. vol. 2, 448–49, 506 (Testimony of Gregory Vega).** And, again, despite the language of the Rule, Vega testified that neither he nor Arias made "any representations to Judge Whelan about exercising due diligence" in discovering the

Omanoff evidence earlier than they alleged. *Id.* **at 475.** When pressed about why he did not push back on the language Arias had included to support the Rule 60(b)(2) argument, Vega restated the reasons that Arias offered during his testimony—that he believed the rule applied because the Omanoff evidence was new to Judge Whelan. *Id.* **at 451, 507.** Vega eventually approved the brief and had Arias forward it to Hagans for final review. **Evid. Hr'g Ex. 316.** Hagans approved the draft without changes on the day before Thanksgiving, Wednesday, November 24, 2021, and it was filed in the Southern District of California the same day. *Id.* **("I have no changes. In[sic] know that is unusual for me.")**

E.    **Judge Whelan's Decision on the Application for Reconsideration**

Judge Whelan denied relief on January 6, 2022, finding that "[m]ost of the evidence was known to [THP] since at least May or June 2021" because the same evidence was included in TPW's "first amended verified complaint" in the Wyoming Antitrust Litigation pending before Judge Johnson. **Evid. Hr'g Ex. 101, at 2, 6.** Judge Whelan correctly identified that only two of the six allegations THP relied on from the October Omanoff affidavit were not already disclosed in the Wyoming litigation months earlier. *See id.* **at 7 ("Defendant THP arguably did not know until October 29, 2021 that Volkov allegedly paid Pazos money from the Relators' share of the settlement agreement . . . or that Volkov failed to provide Omanoff with invoices for work done in this matter.").** However, Vega,

Arias, and Hagans had access to these two pieces of evidence as well through the signed and notarized Wyoming affidavit from May 28, 2021. **Evid. Hr'g Ex. 245, at ¶¶ 20, 24(f).** This all serves to underscore the fact that, despite multiple witnesses testifying that Omanoff provided information "in stages" between May and October 2021, all of the information that THP and its counsel relied upon in support of its November motion for reconsideration in the California *Qui Tam* Litigation was known to them at the very latest by June 2021.

Vega and Arias claim that they were put on notice of their Rule 60(b)(2) error when Judge Whelan issued his order denying their application for reconsideration. Specifically, Vega read the case law that Judge Whelan cited in his opinion indicating that evidence is not "newly discovered" if it "could have been discovered with reasonable diligence," and also that "[e]vidence in the possession of the party before the judgment was rendered is not newly discovered." **Evid. Hr'g Ex. 101, at 5 (citing *Nishimoto v. Cnty. of San Diego*, 850 F. App'x 493, 493 (9th Cir. 2021); *Feature Realty, Inc. v. City of Spokane*, 331 F.3d 1082, 1093 (9th Cir. 2003)); Evid. Hr'g Tr. vol. 2, 510–11 (Testimony of Gregory Vega).** These case citations apparently awakened Vega and Arias to the fact that the argument they had made in their application for reconsideration lacked any sound legal basis. *See* **Evid. Hr'g Tr. vol. 2, 467–68 (Testimony of Gregory Vega); Evid. Hr'g Tr. vol. 2, 560 (Testimony of Ricardo Arias).**

To his credit, in explaining his actions to the Special Master, Vega, as the responsible partner on the matter, accepted full responsibility for the frivolity of the Rule 60(b)(2) argument in the November application for reconsideration and acknowledged that the "came forward" language included therein was misleading. **Evid. Hr'g Tr. vol. 2, 452–53, 455 (Testimony of Gregory Vega).** Similarly, Arias acknowledged that he "embellished" and used the Omanoff affidavit "as a spear . . . in all this litigation," and that he wished he could take back the "came forward" language. **Evid. Hr'g Tr. vol. 2, 569; vol. 3, 599 (Testimony of Ricardo Arias).** Finally, Hagans, for his part, indicated that he "bought" the new evidence argument but realized from what he learned during the Special Master evidentiary hearing that the application for reconsideration included false and misleading statements. **Evid. Hr'g Tr. vol. 3, 785–87 (Testimony of Donald Hagans).**

While commendable, Vega's, Arias's, and Hagans's admissions do not entirely square with their behavior during the litigation of the application for reconsideration. First, Petitioners' memorandum in opposition to THP's application for reconsideration set forth the appropriate legal standard for when a party can introduce "new evidence" in a motion for reconsideration long before Judge Whelan issued his order. *See* **S.D. Cal. Case No. 3:18-cv-02352-W-AHG, ECF No. 35, at 11.** Yet after reviewing the opposition memorandum, Vega and Arias determined that it was not necessary to either correct the arguments they had made in their

application for reconsideration or even to file a reply memorandum. **Evid. Hr'g Tr. vol. 3, 614–16 (Testimony of Ricardo Arias).** Second, after Judge Whelan issued his order, none of the relevant parties here made any effort to correct the false and misleading statements that were put before the court.

Instead, THP made the decision to appeal Judge Whelan's order to the Ninth Circuit, including on Rule 60(b)(2) "newly discovered evidence" grounds. Attorneys Vega and Arias maintained at the evidentiary hearing that they counseled Hagans against filing an appeal, but the evidence shows this to be a disputed factual contention which the Special Master resolves against them below.

### F. THP's Appeal to the Ninth Circuit

#### 1. *Seltzer Caplan's Decision Not to Handle the Appeal*

On February 3, 2022, Gregory A. Vega signed a Notice of Appeal filed in the Southern District of California challenging only Judge Whelan's order denying THP's application for reconsideration. **Evid. Hr'g Ex. 634.** But Vega and his firm, Seltzer Caplan McMahon Vitek, were never meant to argue THP's appeal. Instead, Donald Hagans hired the firm Halpern May Ybarra Gelberg LLP to handle the appeal. However, pressed for time, Hagans asked if Vega could file the NOA and later have Halpern May substitute in as counsel of record for the case before the Ninth Circuit. **Evid. Hr'g Tr. vol. 2, 469 (Testimony of Gregory Vega).** Vega agreed. *Id.*

Email communications between Marc Halpern and Ricardo Arias make clear that Halpern May was reluctant to file the Notice of Appeal themselves because of another THP matter they had pending before Judge Whelan. **Evid. Hr'g Ex. 632.** Marc Halpern did not want Judge Whelan's first impression of his firm to be: "aren't you guys the ones trying to overturn my fee ruling in the Joe Serov [a.k.a. "Sery"] case?" *Id.* Appellate counsel Marina A. Torres, then with Halpern May, substituted in as counsel of record for the THP appeal on February 11, 2022. **Ninth Cir. Case No. 22-55142, ECF No. 3.** While this series of events is uncontroverted, there is considerable dispute over the reasons behind Vega's and Arias's decision not to take the appeal themselves.

Vega's and Arias's explanation of why they did not take the appeal differs significantly from Hagans's and Torres's recollections. Vega testified that, upon reading Judge Whelan's order and reasoning, he had a telephone conference call with Hagans during which he told Hagans he did not believe there was any basis to appeal and advised him against doing so. **Evid. Hr'g Tr. vol. 2, 468–69 (Testimony of Gregory Vega);** *see also* **Evid. Hr'g Tr. vol. 2, 563 (Testimony of Ricardo Arias) ("[Gregory Vega and I] were adamant that we shouldn't appeal. So we conveyed that to Mr. Hagans.").** Arias later testified that he believed a majority of the phone call with Hagans centered on the standard of review on appeal (abuse of discretion). **Evid. Hr'g Tr. vol. 3, 580 (Testimony of Ricardo Arias).** Hagans,

on the other hand, plainly insisted that Vega's and Arias's testimony was "not true," and he was "never told that the appeal was inappropriate." **Evid. Hr'g Tr. vol. 3, 813 (Testimony of Donald Hagans).** Instead, Hagans said the reason that Vega and Arias did not want to do the appeal was "very simple": it was because they "did not do appeals." *Id.* **at 814.** The only thing upon which Hagans appears to agree with Vega and Arias is that the three attorneys did discuss the "difficult standard one would have on appeal," but he vigorously maintained that they never discussed the fact that the Rule 60(b)(2) argument lacked merit. *Id.* **at 855.**

For her part, Marina A. Torres testified that she pulled her call records from Halpern May and discovered a four-minute call with Ricardo Arias on February 10, 2022. **Evid. Hr'g Tr. vol. 3, 635–36, 678 (Testimony of Marina Torres).** Torres testified that she asked Arias if there was anything about the case that she needed to know. *Id.* **at 636.** Arias responded that everything she needed to know was included in the district court record and the reason his firm did not take the case was because they do not handle appeals. *Id.* Arias confirmed that he never communicated to Torres his firm's conclusion that there were no meritorious grounds for an appeal. **Evid. Hr'g Tr. vol. 3, 584–85 (Testimony of Ricardo Arias).**

The only evidence, beyond their own testimony, that Vega or Arias said anything to anyone about the lack of merit in an appeal is a single email from Donald Hagans to Vega and Arias from January 28, 2022. The email says that Hagans

"[f]ully understand[s] the odds . . . and a reluctance to appeal." **Evid. Hr'g Ex. 317.** This could be interpreted to corroborate Vega's and Arias's testimony. However, Hagans explained that "the odds" referenced the standard of review on appeal, which he agreed the three of them discussed, and that "reluctance to appeal" referenced Vega's and Arias's disinterest in appellate work. **Evid. Hr'g Tr. vol. 3, 854–55.** Alone, both of these interpretations seem equally plausible.

Looking at the complete body of evidence, however, it appears to the Special Master that it far more likely that Vega and Arias never communicated any misgivings to Hagans, Torres, or anyone else about the merits of the appeal beyond the exacting standard of review. In addition to gauging the demeanor of each witness while they testified, including their mannerisms, ability to recall details, hostility to the examiner, and congruity with other evidence presented during the hearing, the Special Master also makes that factual finding from the following considerations.

For one, Vega and Arias did not produce any contemporaneous notes, emails, correspondence, or internal memoranda memorializing their belief that an appeal would be meritless and contrary to controlling law. For such a strong objection conveyed to a client, such a practice is, in the undersigned's experience handling similar cases, routine. Moreover, Vega's and Arias's contention that any appeal would be frivolous is difficult, if not impossible, to square with their testimony that they stand by the arguments raised in their motion for reconsideration separate and

apart from the Rule 60(b)(2) "new evidence" argument. ***See* Evid. Hr'g Tr. vol. 2, 452 (Testimony of Gregory Vega) ("I still would have brought [the motion for reconsideration] . . . under the . . . (b)(3) section for fraud, misconduct, and the all relief available."); *id.* at 531 ("I believed the 60(b)(3) and 60(b)(6) . . . were good arguments."); Evid. Hr'g Tr. vol. 2, 561 (Testimony of Ricardo Arias) (stating that he would have still brought the motion for reconsideration under subsections 60(b)(3) and (6)).**

Additionally, there is substantial evidence to support the conclusion that Vega and Arias did not take the appeal simply because they are not appellate attorneys. First, Arias himself testified that he has never handled an appeal, and that he believed it had been years since Vega last did. **Evid. Hr'g Tr. vol. 3, 622 (Testimony of Ricardo Arias).** Second, in an email from Ricardo Arias to Marc Halpern on February 3, 2022, Arias stated that "[n]either Gregory A. Vega or I are appellate attorneys . . . [and] [w]e expect that a substitution by your firm be made expeditiously." **Evid. Hr'g Ex. 632;** *see* **Evid. Hr'g Ex. 633 (Email from Marc Halpern to Marina Torres from February 1, 2022) ("Seltzer Caplan handled the district court case but say they don't really do appeals.").** Third, Hagans's and Torres's testimony confirms that Vega and Arias communicated that the reason they were not taking the appeal was due to their lack of appellate experience.

Finally, the two attorneys continued to represent THP in the ongoing federal criminal investigation. That investigation kept their firm heavily engaged in billable work for several months. They may well have been reluctant to push their client too hard on this appeal in order to maintain good continuing relations with Mr. Hagans.

Accordingly, the Special Master finds that based on the entirety of the evidence, Vega and Arias never communicated a belief that an appeal would lack merit to Hagans in the weeks between Judge Whelan's order denying their motion for reconsideration and the appeal to the Ninth Circuit. Nor did they say that to Marina A. Torres. **Evid. Hr'g Tr. vol. 3, 636–37 (Testimony of Marina Torres).** The lack of contemporaneous documentation serves as evidence suggesting that they may never have harbored these reservations at all. Instead, the Special Master finds that the reason they did not take the appeal was simply based on the fact that neither Vega nor Arias had appellate experience and felt their time was better spent continuing to represent THP in the ongoing criminal investigation.

## 2. *THP's Initial Appeal to the Ninth Circuit*

After managing partner Marc Halpern agreed to undertake the appeal on behalf of THP, he determined that Marina A. Torres, an experienced attorney with Halpern May, would serve as counsel of record for the case. *See* **Evid. Hr'g Ex. 632; Evid. Hr'g Tr. vol. 3, 634 (Testimony of Marina Torres).** Torres testified that it was her practice whenever she began working on an appeal to reach out to

trial counsel and ask if there was anything particular about the case that she should know before starting on the opening brief. **Evid. Hr'g Tr. vol. 3, 635 (Testimony of Marina Torres).** She testified that this was the purpose of her call to Ricardo Arias on February 10, 2022. As discussed above, there is some dispute over the content of this initial call. *See* **Evid. Hr'g Ex. 318.** However, it is undisputed that Arias did little more than ensure that Torres had the district court record. What is certain is that he did not inform Torres about any earlier Dennis Omanoff affidavits or raise any red flags surrounding the "new evidence" argument.

Torres also had an introductory call with Donald Hagans to discuss the case. During this call, Torres told Hagans that she thought THP's chances on appeal were low but that the issues had merit based on what she knew at the time. **Evid. Hr'g Tr. vol. 3, 637 (Testimony of Marina Torres).** Hagans indicated that he wanted to move forward with the appeal regardless, partially because he believed it would give TPW some leverage in the ongoing Wyoming Antitrust Litigation. *Id.* **at 695–96.** In all of Torres's conversations and email exchanges with Donald Hagans during the preparation of the appeal, he never told her about the existence of any prior drafts of the Omanoff affidavits or the extent of his personal engagement with Omanoff in May or June of 2021. *See id.* **at 638; Evid. Hr'g Tr. vol. 3, 814–15 (Testimony of Donald Hagans).** Hagans attributes this to the fact that he "bought the Kool-Aid" with respect to Vega's and Arias's theory on why the October 29, 2021, Omanoff

Allegations constituted "new evidence" under Rule 60(b)(2) and therefore did not consider those earlier communications relevant to the appeal. **Evid. Hr'g Tr. vol. 3, 815–16 (Testimony of Donald Hagans).**

In the end, relying on the district court record and her conversations with Hagans, Torres prepared an opening brief for the Ninth Circuit appeal that effectively regurgitated the arguments Vega and Arias made in their application for reconsideration in the San Diego district court. Thus, THP doubled down on its claim that the Omanoff Allegations were "new evidence" warranting reconsideration of the fee award and could not have been discovered with reasonable diligence prior to Omanoff filing his affidavit in the Wyoming Antitrust Litigation on October 29, 2021. *See* **Evid. Hr'g Ex. 211, 28–32.**

In drafting the opening brief, Torres testified that she did not thoroughly review the Wyoming pleadings, despite the fact that those pleadings served as a strong basis for Judge Whelan's denial of the underlying application for reconsideration. **Evid. Hr'g Tr. vol. 3, 714 (Testimony of Marina Torres).** If she had, she may have more seriously questioned the plausibility that Mr. Omanoff could have "only come forward" with a twelve-page affidavit and hundreds of pages of exhibits in the two days between Judge Whelan denying the application for reconsideration on October 27, 2021, and the affidavit's filing in Wyoming on

October 29, 2021.[9] In Torres's defense, even if she had thoroughly studied those pleadings, she could not have conclusively determined that Omanoff was cooperating with TPW/THP in May or June of 2021. Only Hagans, Vega, or Arias could have communicated that information to her—and they never did. She never spoke or communicated with Omanoff. **Evid. Hr'g Tr. vol. 3, 658 (Testimony of Marina Torres).**

Once Torres concluded drafting the brief, replete with the same false statements about when Omanoff "came forward" and what THP knew about his cooperation prior to October 29, 2021, she sent it to Marc Halpern for his review. **Evid. Hr'g Tr. vol. 3, 643–44 (Testimony of Marina Torres).** Halpern approved it with minor edits, after which Torres sent the brief to Hagans for final review and approval before filing it. ***Id.*** **at 644–45.** Just as he did with Arias's draft of the application for reconsideration, Hagans approved Torres's draft opening brief without any edits. ***Id.*** **at 645; Evid. Hr'g Ex. 605.** Torres filed that brief in the Ninth Circuit on May 4, 2022.

On December 9, 2022, a panel consisting of U.S. Circuit Judges Marsha S. Berzon, Ryan D. Nelson, and Bridget S. Bade heard oral argument in THP's appeal. During her presentation, Torres did not even address the "new evidence" argument.

---

[9] Indeed, this is an argument Petitioners made in briefing to the San Diego district court in opposition to THP's application for reconsideration. ***See*** **S.D. Cal. Case No. 3:18-cv-02352-W-AHG, ECF No. 35, at 6 n.5.**

Instead, she focused on what she perceived to be the "much stronger" issue in the case, challenging Judge Whelan's calculation of the actual fee award. **Evid. Hr'g Tr. vol. 3, 647 (Testimony of Marina Torres).** In the last minute of Torres's rebuttal, Judge Berzon asked whether counsel was essentially abandoning the new evidence argument, at which point Torres chuckled and acknowledged that she "thought it best to focus most of [her] time on the first argument." *Id.* **at 653.** Judge Berzon commented that she thought that was a wise decision. In the end, the panel affirmed the district court in a memorandum disposition filed on January 12, 2023.

### 3. *THP's Petition for Panel Rehearing*

On January 26, 2023, THP filed a petition for panel rehearing, thereby *tripling down* on its argument that Omanoff's October Affidavit constituted new evidence. *See* **Evid. Hr'g Ex. 105.** Specifically, THP argued that it "had not previously been aware of the . . . evidence detailed in Omanoff's affidavit [] until two days after the order was signed" and that the panel's disposition "ignore[d] that Omanoff's testimony did not come to light until the day he came forward and day the affidavit was signed." *Id.* **at 6–7.**

Marina A. Torres prepared the substance of the petition for panel rehearing at the direction of Donald Hagans. **Evid. Hr'g Tr. vol. 3, 655, 734–35 (Testimony of Marina Torres).** However, she left Halpern May to join her current firm, Willkie Farr & Gallagher, as a partner roughly a week before the petition was actually filed.

**Evid. Hr'g Tr. vol. 1, 48 (Testimony of Thomas Rubinsky).**  Thomas Rubinsky, an associate at Halpern May, was tasked with taking the petition across the finish line.  By the time Rubinsky inherited the petition, all of the substantive arguments were complete.  *Id.* **at 49.**  Having come onto the case so late, all Rubinsky did was make some stylistic changes, check the citations, and actually file the petition with the Ninth Circuit.  *Id.*  He billed just 2.8 hours to the matter.[10]  *Id.* **at 84.**

As for Hagans, he approved the petition for rehearing as a matter of course.  **Evid. Hr'g Tr. vol. 3, 819–21 (Testimony of Donald Hagans).**  The panel denied the petition for rehearing on January 30, 2023, and the mandate issued in the case on February 7, 2023.  **Ninth Cir. Case. No. 22-55142, ECF Nos. 41–42.**

---

[10] Based on the testimony elicited during the evidentiary hearing in this matter, the Special Master issued an order discharging the Order to Show Cause with regard to Mr. Rubinsky.  **Ninth Cir. Case No. 23-80039, ECF No. 83.**  The Special Master concludes that Rubinsky did not engage in sanctionable conduct.  Although Rubinsky signed and filed a petition that included material misrepresentations and false statements without conducting an inquiry into the factual bases underlying those statements, the Special Master finds that Rubinsky, as an associate at Halpern May, had little control over the merits and was effectively "thrown in at the last minute" to cover for the departure of Ms. Torres.  Moreover, as this Report and Recommendation has detailed, the incomplete and misleading information available to Halpern May attorneys when the petition for panel rehearing was filed supported the arguments included therein.  For these reasons, the Special Master recommends Thomas Rubinsky "remain in good standing with the Ninth Circuit Court of Appeals and that no sanctions or other disciplinary action be imposed against him."  *Id.*

### G. GTP's Motion for Sanctions and the Appointment of the Special Master

On February 13, 2023, GTP filed a motion for sanctions against THP with the Ninth Circuit panel. **Ninth Cir. Case. No. 22-55142, ECF No. 43.** The motion was triggered by a new filing submitted by TPW in the Wyoming Antitrust Litigation on January 27, 2023. **D. Wyo. Case No. 2:21-cv-00099-ABJ, ECF No. 135.** In the Wyoming filing, TPW now provided a timeline detailing Omanoff's cooperation. *Id.* at ¶ 3. The timeline confirmed that Omanoff began cooperating with TPW around May 2021, after he was served with the complaint in the Wyoming Antitrust Litigation, and that he provided TPW with "[a]ffidavits, documents, and other evidence." *Id.* Accordingly, in its motion for sanctions, GTP argued that THP's repeated assertion in the California *Qui Tam* Litigation that the October 2021 Omanoff Affidavit contained new, previously undiscoverable evidence was false, misleading, and sanctionable. **Ninth Cir. Case. No. 22-55142, ECF No. 43.**

Torres testified that Marc Halpern called her at Willkie Farr to inform her about the motion. **Evid. Hr'g Tr. vol. 3, 660 (Testimony of Marina Torres).** Halpern asked if Torres would be interested in litigating the motion for sanctions given her work on the underlying appeal. *Id.* at 660–61. After consulting with the partnership at her new firm, she accepted and made a new appearance as attorney of record for THP. *Id.* at 661; **Ninth Cir. Case No. 22-55142, ECF Nos. 44–45.**

Torres testified that the first red flag in all of this litigation was raised in her mind when she read GTP's motion for sanctions. **Evid. Hr'g Tr. vol. 3, 657 (Testimony of Marina Torres).** This was due to the substance of GTP's argument and also the Wyoming pleading referenced in the motion, which indicated that Omanoff had been cooperating since May 2021. *Id.* **at 657, 659, 661.** Torres's first step was to call Donald Hagans. *Id.* **at 661–62.** On February 14, 2023, she followed up with Hagans via email. *See* **Evid. Hr'g Ex. 623.** Her email, in relevant part, stated:

> It would be helpful to get a timeline of the interactions with Omanoff. [GTP is] claiming that the "admission" in the January TPW filings shows that THP knew, as early as May 2021 and prior to Oct 2021, of the new evidence that was in Omanoff's affidavit. So the interactions during that time will be important to understand (and possibly incorporate into the briefing).

*Id.* Two days later, on the same email chain, she followed up and said, "I've begun drafting the brief and just want to make sure I have an accurate accounting of THP/TPW's interactions with Omanoff." *Id.*

Hagans eventually got back to Torres on February 22, 2023. In his email, Hagans attached thirteen filings from the Wyoming Antitrust Litigation and indicated that the filings "provide[] the full context." **Evid. Hr'g Ex. 624.** The body of Hagans's email included several paragraphs of information that are, admittedly, difficult to decipher. However, Hagans was adamant that GTP's argument on the "key issue of whether we were actively [] working with Omanoff . . . is simply not

the case." *Id.* Hagans said that while he wished that he could "do more on the initial affidavits . . . what happened is as set out by Attorney Vega and his firm." *Id.* While Hagans did hint to the fact that Omanoff was cooperating earlier than October 2021, he stated that "much of what was provided by Omanoff was privileged," his cooperation came "in stages," and the information could not be discovered or used while Omanoff remained adverse. *Id.* Torres testified that she recalled Hagans telling her that information from Omanoff came in "dribs and drabs" during the summer of 2021, but that there were certainly no substantive interactions with Omanoff at that time. *See* **Evid. Hr'g Tr. vol. 3, 686, 737 (Testimony of Marina Torres).**

During the evidentiary hearing in this matter, Hagans confirmed that he did not disclose the May affidavits to Torres in their conversations about the motion for sanctions. **Evid. Hr'g Tr. vol. 3, 856.** The reasons Hagans offered for not providing this information were contradictory. At one point he testified that he "didn't think [the May 2021 Omanoff affidavits] were relevant based on the legal argument that was being presented" in Torres's draft of the opposition to GTP's motion for sanctions. *Id.* **at 824.** But later, he testified that he did not tell Torres about the affidavits because he did not remember that they existed. *Id.* **at 856.** In any event, Hagans acknowledged that his failure to disclose the full scope of his communications with Omanoff in May and June of 2021 to Torres or the court,

including the existence of seven or more draft affidavits created during those months, was "bush league." *Id.* **at 825.**

Torres took Hagans's February 22, 2023, email to mean that the arguments Vega and Arias made in their application for reconsideration were accurate. **Evid. Hr'g Tr. vol. 3, 667 (Testimony of Marina Torres).** Still, Torres reached out to both Vega and Arias directly to confirm that her understanding of the timeline surrounding Omanoff's cooperation was correct. *See* **Evid. Hr'g Ex. 626.** Torres attached both the motion for sanctions and the memorandum of points and authorities that Arias prepared in support of the underlying application for reconsideration. *Id.* She stated:

> Global Tungsten is essentially claiming that we misled the courts by claiming that Omanoff "came forward" on October 29, 2021 (the day the affidavit was signed), even though he had been cooperating with TPW since May 2021. Our opposition is due tomorrow, and I just want to make sure that I'm accurately representing the interactions with Omanoff that occurred from May 2021 to October 2021.

*Id.*

Arias conferred with Vega and got back to Torres with a response that the Special Master finds deceptive and inexplicable. He said: "I spoke with [Vega], and he confirmed we never had any interactions with Dennis Omanoff. On November 1, 2021, we received the Omanoff declaration filed in the Wyoming litigation from Don Hagans which we subsequently included in the Motion for Reconsideration of the Court's Order." **Evid. Hr'g Ex. 628.**

Vega and Arias both attempted to explain this communication during the evidentiary hearing. Vega testified that he "assumed" Torres was getting the information about the May Omanoff communications and declarations from Hagans. **Evid. Hr'g Tr. vol. 2, 521 (Testimony of Gregory Vega).** Arias similarly assumed that Torres "already knew about the . . . May affidavits." **Evid. Hr'g Tr. vol. 3, 594 (Testimony of Ricardo Arias).** Arias also testified that the reason he did not disclose the existence of any earlier draft Omanoff affidavits was because "she never asked." *Id.* **at 595.** Worse still, although Arias apparently recognized that the motion for sanctions "looked serious," he testified that he did not think he even "read the thing." *Id.* **at 594.**

One fact is clear: neither Vega nor Arias communicated anything to Ms. Torres about THP's interactions with Omanoff in May and June of 2021. This is despite the fact that Vega testified he was well aware of the mistakes that he and Arias had made in presenting the new evidence argument to the district court below. Indeed, if Vega and Arias are taken at their word, when they were communicating with Torres in February 2023, they held a firm conviction that THP never should have appealed Judge Whelan's order. Yet, when Torres sought their help in responding to the motion for sanctions that had to do with the very argument Vega and Arias apparently now realized was made in error in the first instance *because of*

the May and June Omanoff affidavits and communications, they still failed to disclose that information to her.

Based on the communications she had with Hagans, Vega, and Arias, Torres prepared the opposition to GTP's motion for sanctions. The representations in that opposition *quadrupled down* on the new evidence argument. Torres testified that she believed the full scope of THP's communications with Omanoff were as represented in the underlying application for reconsideration and that any communications TPW had with Omanoff between May and October 2021 were incredibly "limited" and potentially even "hostile." **Evid. Hr'g Tr. vol. 3, 688 (Testimony of Marina Torres).**

Still, the language in the opposition changed somewhat to incorporate Torres's understanding that there were at least *some* communications with Omanoff during that period of time. For example, the opposition acknowledges for the first time that there may have been some May communications between Omanoff and TPW but that those communications were "piecemeal, conducted through layers of attorneys, and, critically, were not statements made under penalty of perjury." **Evid. Hr'g Ex. 214, at 19.** On the witness stand, Torres maintained that when she submitted the opposition to sanctions, she still "had no idea of the existence of any draft declarations or affidavits." **Evid. Hr'g Tr. vol. 3, 689 (Testimony of Marina Torres).**

Once again, Hagans approved her draft of the opposition to GTP's motion for sanctions without any edits. **Id. at 672–75; Evid. Hr'g Exs. 629, 630.** Torres filed the opposition on February 23, 2023. **Evid. Hr'g Ex. 214.**

The Special Master finds that although Torres should have probed further into the scope of communications with Omanoff prior to October 2021, she acted with reasonable diligence in preparing the opposition to GTP's motion for sanctions. Torres's representations in the opposition were made in good faith based on the information she had at the time from her client and *qui tam* counsel. On the other hand, the Special Master finds that, based on the interactions detailed above, Hagans, Vega, and Arias acted with reckless disregard for the truth in their communications with Torres surrounding GTP's motion for sanctions.

### H.   Relevant Developments in the Wyoming Antitrust Litigation

Concurrently with the Ninth Circuit appeal in the California *Qui Tam* Litigation, motion practice was ongoing in the Wyoming Antitrust Litigation. Goetz filed the verified First Amended Complaint in Wyoming on June 25, 2021. **D. Wyo. Case No. 2:21-cv-00099-ABJ, ECF No. 11.** The First Amended Complaint relied significantly on the numerous draft Omanoff affidavits from May and June 2021, and included direct quotes from those drafts, but it did not include an attached Omanoff affidavit. **Id. at ¶¶ 23, 43(d), 43(f).** Later in the Wyoming litigation, Judge Johnson granted a motion to dismiss filed by all defendants in the case except for

Dennis Omanoff and Alonso Martinez, given the broad release and waiver language covering all known and unknown claims in the Pennsylvania litigation settlement agreement. **D. Wyo. Case No. 2:21-cv-00099-ABJ, ECF No. 75.** That ruling is now on appeal to the Tenth Circuit Court of Appeals, Case No. 23-8018.

On September 8, 2022, Goetz filed on behalf of TPW a Motion for Leave to File a Second Amended Complaint and asked Judge Johnson to reconsider his order granting the various defendants' motion to dismiss. *See* **Evid. Hr'g Ex. 206.** In her motion, Goetz made some of the same misleading arguments that appeared in Vega's and Arias's application for reconsideration in the California *Qui Tam* Litigation. Namely, she declared that "Omanoff broke ranks after the filing of the Plaintiff's *First Amended Verified Complaint* and then again following the Court's Order (ECF 75)." *Id.* **at ¶ 10;** *see also* **Evid. Hr'g Ex. 253, at ¶ 6 ("Responding Defendants mistakenly assumed that TPW previously had access to all information held by Mr. Omanoff. It absolutely did not . . . . TPW had no legal right to the evidence and could not force Mr. Omanoff to provide such evidence.").**

While Goetz appears to be alluding to the fact that Omanoff provided additional documents and evidence after she filed the First Amended Complaint, the statement that Omanoff "broke ranks" after it was filed is simply not true. *See* **Evid. Hr'g Tr. vol. 2, 372 (Testimony of Megan Overmann Goetz).** Goetz filed her First Amended Complaint on June 25, 2021, after Hagans's meetings with Omanoff

in Florida in both May and June 2021 and, critically, after Goetz herself had received numerous draft affidavits formatted on her own firm's pleading paper in connection with those meetings.

To Goetz's credit, in a filing from January 27, 2023, she provided the Wyoming district court with a more detailed, and indeed, more accurate timeline of Omanoff's cooperation with TPW in the Wyoming Antitrust Litigation. **D. Wyo. Case No. 21-cv-00099-ABJ, ECF No. 135.** In that filing, Goetz informed Judge Johnson that Omanoff offered to cooperate with TPW in May 2021 and proceeded to provide TPW with "[a]ffidavits, documents, and other evidence in stages." *Id.* **at ¶ 3.** Accordingly, the Special Master finds that Ms. Goetz made some misleading statements to the district court in Wyoming, particularly in TPW's motion seeking reconsideration of Judge Johnson's order granting the motion to dismiss. However, taken in context, those misrepresentations are less serious than those lodged by THP with the district court in the California *Qui Tam* Litigation. Moreover, unlike counsel in the *qui tam* matter, Goetz, in subsequent Wyoming filings, provided Judge Johnson with more substantive information detailing Omanoff's cooperation and communication with TPW in May and June 2021.

## I. Special Master Proceedings

The Ninth Circuit panel obviously recognized that understanding the facts behind GTP's motion for sanctions, as well as the existence of related litigation in

multiple federal districts, would be important in considering the merits of that motion. In an order dated March 30, 2023, the panel appointed the undersigned as Special Master under Fed. R. App. P. 48 "to conduct any proceedings he deems appropriate to determine the scope of any misconduct, including knowing misrepresentations to the district court and this court, pertaining to the Omanoff affidavit, Appellant's application for reconsideration, and this appeal." **Ninth Cir. Case No. 23-80039, ECF No. 1, at 4.** The panel observed in the Appointment Order that:

> TPW's statement that it was cooperating with Omanoff as early as May 2021 raises serious questions about whether the repeated representations [THP] has made in this case that Omanoff's information constituted "newly discovered evidence that, with reasonable diligence, could not have been discovered in time," were frivolous and/or made in bad faith.

*Id.* **at 3 (quoting Fed R. Civ. P. 60(b)(2)).** The Special Master was authorized to prepare a written report and recommendation to the panel regarding any potential sanctions or disciplinary measures to be imposed against THP and its counsel. *Id.* **at 4.**

The initial status conference with the Special Master took place on May 12, 2023. **Ninth Cir. Case No. 23-80039, ECF No. 2.** The parties filed short pre-conference briefs stating their respective positions. *See* **Ninth Cir. Case No. 22-55142, ECF Nos. 54, 55.** Unsurprisingly, THP's pre-conference briefing effectively restated the arguments Torres made in her opposition to GTP's motion for sanctions.

The briefing did not contain any information about Omanoff affidavits from May or June of 2021. *See* **Ninth Cir. Case No. 22-55142, ECF No. 54; Evid. Hr'g Tr. vol. 3, 834 (Testimony of Donald Hagans).** Appearing for THP were Ethan Brown and Tom Rickeman of the firm Brown, Neri, Smith & Khan LLP (THP's Special Master counsel), Marina A. Torres, Gregory A. Vega, and Ricardo Arias. Appearing for GTP were Jessica Sanderson and Sam Finklestein of the Volkov Law Group. Pursuant to the first status conference, the Special Master issued an order setting a briefing schedule and scheduling a second status conference for July 7, 2023. **Ninth Cir. Case No. 23-80039, ECF No. 4.**

1.     *THP's Opening Brief and Supporting Declarations*

Attorneys Brown and Rickeman worked on THP's opening brief for eventual filing with the Special Master. In preparing the opening brief, Donald Hagans participated in interviews that Brown and Rickeman conducted with Gregory A. Vega, Ricardo Arias, Megan Overmann Goetz, and Dennis Omanoff. **Evid. Hr'g Tr. vol. 3, 832 (Testimony of Donald Hagans).** Omanoff's May affidavits did not come up at any point during these various interviews or conversations. *Id.* Eventually, however, Hagans asked Goetz to go through her emails and files in connection with any Dennis Omanoff communications that may have occurred in May or June of 2021. *Id.* at 834; **Evid. Hr'g Tr. vol. 2, 327–28 (Testimony of Megan Overmann Goetz).** That email search uncovered one draft Omanoff

affidavit from May 2021 prepared for the Wyoming Antitrust Litigation. **Evid. Hr'g Tr. vol. 3, 833 (Testimony of Donald Hagans);** *see* **Evid. Hr'g Ex. 514.** However, none of the relevant parties came forward with the May drafts of the Omanoff affidavits prepared for the California *Qui Tam* Litigation, and Hagans surprisingly testified that he did not remember that they existed at the time Brown and Rickeman were preparing THP's opening brief. *See* **Evid. Hr'g Tr. vol. 3, 836–37 (Testimony of Donald Hagans).**

Following the initial interviews, Brown and Rickeman filed THP's opening brief with the Special Master on June 12, 2023. **Evid. Hr'g Ex. 217.** Because Goetz had uncovered one May Wyoming affidavit, the brief revealed that Omanoff had prepared "an earlier, un-notarized version of an affidavit in May 2021" but asserted "[c]ritically, the May 2021 affidavit was prepared solely in connection with the Wyoming Suit and was not provided to THP's counsel in the *qui tam* case." *Id.* at 5–6. THP filed supporting declarations from Dennis Omanoff, Gregory A. Vega, Marina A. Torres, and Megan Overmann Goetz concurrently with its opening brief. *Id.* at 4.

Omanoff's declaration indicated that he began cooperating with TPW shortly after he was served with the complaint in the Wyoming Antitrust Litigation. **Evid. Hr'g Ex. 116, ¶ 14.** He further stated that he prepared and executed one draft affidavit, but that "[n]one of the lawyers involved in the *qui tam* action in California

were involved in those discussions." *Id.* During the evidentiary hearing, Omanoff testified that, at the time he prepared his initial declaration for the Special Master proceedings, he did not have any specific recollection of preparing other affidavits for the California *Qui Tam* Litigation. **Evid. Hr'g Tr. Vol. 1, 221 (Testimony of Dennis Omanoff).** He was unable to recall whether he or Hagans drafted the declaration. *Id.* **at 220–21.**

Gregory A. Vega's declaration swore that he and Ricardo Arias had "no involvement in drafting the [October] Dennis Omanoff Affidavit" that they used in support of their application for reconsideration and only learned that the affidavit existed after it was filed in the Wyoming Antitrust Litigation on October 29, 2021. **Evid. Hr'g Ex. 312, at ¶¶ 4, 6.** Further, Vega declared that he and Arias "did not make any misrepresentations to the District Court." *Id.* **at ¶ 9.** Vega testified that the reason he did not include any information about the May Omanoff affidavits in his declaration to the Special Master was because the May affidavits were never presented to the San Diego district court. **Evid. Hr'g Tr. vol. 2, 479 (Testimony of Gregory Vega).** At the same time, Vega said he read the Ninth Circuit's Appointment Order prior to preparing his declaration, which explicitly stated that the purpose of the Special Master's inquiry was to determine whether the repeated allegations that Omanoff only "came forward" in October 2021 were untrue. *Id.* **at 478; Ninth Cir. Case No. 23-80039, ECF No. 1.** Arias, for his part, testified that

he was aware that Vega was making characterizations on his behalf in Vega's declaration, and had the chance to review it, but did not discuss with Vega the need to make any changes to the declaration before Vega filed it. **Evid. Hr'g Tr. vol. 3, 620–21 (Testimony of Ricardo Arias).**

Accordingly, the Special Master finds that, once again, Vega and Arias acted with reckless disregard for the truth of the statements included in Vega's declaration before the Special Master. Vega and Arias were apprised of the nature of the Special Master's inquiry at the status conferences they attended but failed to disclose the full scope of Omanoff's cooperation in the months prior to October 2021.

Rickeman emailed Megan Overmann Goetz a draft of her own declaration on the morning of June 12, 2023. **Evid. Hr'g Tr. vol. 2, 340 (Testimony of Megan Overmann Goetz); Evid. Hr'g Ex. 511.** At this point, Goetz had already been working with a third-party IT provider searching her firm's databases to uncover any communications related to Dennis Omanoff's cooperation with TPW prior to October 2021. **Evid. Hr'g Tr. vol. 2, 335–36 (Testimony of Megan Overmann Goetz); Evid. Hr'g Ex. 501.** Goetz testified that when she was asked to provide a declaration for the Special Master proceeding, she did not have a full understanding of what the proceedings were about. **Evid. Hr'g Tr. vol. 2, 338 (Testimony of Megan Overmann Goetz).** She did not read any of the briefing in the matter, she did not read any of the pleadings in the underlying *qui tam* action, and she did not

read GTP's motion for sanctions. *Id.* **at 338–40.** According to Goetz, she simply understood the matter as "continued back and forth between Global Tungsten and THP." *Id.* **at 338.**

Goetz's final declaration included some troubling statements. First, the declaration makes no mention of any Dennis Omanoff affidavits from May or June of 2021. *See* **Evid. Hr'g Ex. 500.** Second, Goetz states that she had "*no substantive involvement* in the preparation of the draft affidavit and provided *no substantive input* on the facts contained in the draft [she] received." *Id.* **(emphasis added).** However, again, Goetz did not prepare the first draft of her declaration. **Evid. Hr'g Tr. vol. 2, 340 (Testimony of Megan Overmann Goetz).** Eighteen minutes after Rickeman sent Goetz a draft declaration, she returned redline edits and comments. *See* **Evid. Hr'g Ex. 511.** Despite her contention that she had "no substantive involvement" in the creation of the Omanoff affidavit (when it is now known that she was in contact with Hagans throughout the entire process and provided a draft of several Omanoff affidavits on her firm pleading paper), Goetz does acknowledge in a marginal comment note in the red-lined edits that she was asked to "provide the caption, do some formatting and definitely fix / correct typos." *Id.* Finally, Goetz deleted a paragraph that claimed she did not receive any evidence from Mr. Omanoff that could have been used in a court proceeding prior to the October 29, 2021, affidavit. *Id.*

To be sure, Goetz should have made a more concerted effort to uncover the nature of the Special Master proceedings for which she was being asked to file a declaration under the penalty of perjury. Her signed declaration includes misleading statements about the nature and scope of her involvement that fold into a larger pattern of widespread attorney misconduct in this case. However, the Special Master finds that Goetz was merely negligent in allowing this declaration to have been filed in its final form. She did not act in bad faith or with the intention to mislead the Special Master.

### 2. *THP's Request to Correct Its Opening Brief*

Shortly before GTP's answer became due, THP filed a request for leave to correct its opening brief. THP claimed that it had "discovered that certain statements in [its] Opening Brief [were] not accurate." **Evid. Hr'g Ex. 221.** Namely, THP's Special Master counsel "learned for the first time that the May 2021 affidavit by Dennis Omanoff referenced in the Opening Brief was transmitted to THP's *qui tam* counsel in late May 2021." ***Id.*** The Special Master granted THP's motion to file a corrected opening brief, reset the status conference for July 21, 2023, and granted GTP additional time to file its answering brief. **Ninth Cir. Case No. 23-80039, ECF No. 12.**

The basis for THP's request to correct its opening brief came after THP's Special Master counsel transmitted a copy of the original opening brief to Vega and

Arias for review on June 13, 2023. **Evid. Hr'g Ex. 314.** In the cover email, THP's Special Master counsel reported that they had uncovered the May 2021 Wyoming affidavit but made clear in their opening brief that they believed "this early affidavit was never provided to THP's [*qui tam*] counsel." ***Id.*** Vega wrote back to inform THP's Special Master counsel for the first time that they had in fact received a signed Omanoff affidavit in May 2021.[11] ***Id.*; Evid. Hr'g Tr. vol. 2, 491 (Testimony of Gregory Vega).** Despite multiple interviews and conversations in advance of the opening brief being filed, this was the first time that anyone had made THP's Special Master counsel aware of the fact that THP's *qui tam* counsel was receiving information and affidavits from Omanoff as early as May 2021. And as a result of the corrected brief, it was the first time in these lengthy proceedings that any court had been made aware of that fact as well.

GTP filed a timely answering brief suggesting that the Ninth Circuit could now "impose joint and several liability on [THP] and its counsel" based on the record before the court and particularly in light of THP's recent admission that it had a May 2021 draft of the Omanoff Affidavit. **Ninth Cir. Case No. 23-80039, ECF No. 16, at 2.** In the alternative, GTP requested that the Special Master issue an order to show

---

[11] Despite this apparent revelation on Vega's part, he made no effort to correct his declaration to the Special Master in which he claimed that he had not received an Omanoff affidavit prior to November 1, 2021. When asked why not at the second status conference, he froze. **Ninth Cir. Case No. 23-80039, ECF No. 32, at 21.**

cause why sanctions should not issue, and that he question counsel under oath regarding their knowledge of the May 2021 affidavit. *Id.* GTP also requested that the Special Master require production of "all drafts of Omanoff's affidavit." *Id.* at 27.

The Special Master subsequently issued an order requiring production of "the May 2021 draft Dennis Omanoff Affidavit along with any related drafts and communications between THP's *qui tam* counsel and TPW's counsel." **Ninth Cir. Case No. 23-80039, ECF No. 18.** THP's Special Master counsel was further ordered to submit a declaration explaining the precise details behind the transmittal of the May 2021 affidavit from TPW's counsel to THP's *qui tam* counsel. *Id.*

THP's responsive filings on July 19, 2021, were nothing short of shocking. **Ninth Cir. Case No. 23-80039, ECF No. 22.** THP admitted that: (1) THP and TPW share the same corporate counsel, Donald Hagans; (2) Hagans met with Omanoff in May 2021 and the two drafted several affidavits; (3) Hagans and Omanoff drafted, and Omanoff executed, a notarized affidavit dated May 27, 2021, *for potential filing* in the California *Qui Tam* Litigation; (4) Hagans transmitted that signed affidavit, and other drafts, to THP and TPW's outside counsel for the California *Qui Tam* Litigation and for the Wyoming Antitrust Litigation. *See id.* Acknowledging the gravity of these disclosures, THP offered to stipulate to the entry of sanctions against it. *Id.*

Following the status conference on July 21, 2023, the Special Master then issued an Order to Show Cause why "sanctions should not be imposed on" THP, Gregory A. Vega, Ricardo Arias, Megan Overmann Goetz, Marina A. Torres, Thomas Rubinsky, and Donald Hagans for the "numerous misrepresentations [Respondent] caused to be filed in various courts." **Ninth Cir. Case No. 23-80039, ECF No. 31.** The Special Master further ordered an evidentiary hearing to convene on August 8, 2023, in Coeur d'Alene, Idaho. *Id.* The following witnesses appeared for the three-day evidentiary hearing where they testified under oath before the Special Master subject to cross-examination: (1) Dennis Omanoff; (2) Russell Lewis; (3) Donald Hagans, Esq.; (4) Jerry Alexander, Esq.[12]; (5) Megan Overmann Goetz, Esq.; (6) Gregory A. Vega, Esq.; (7) Ricardo Arias, Esq.; (8) Marina A. Torres, Esq.; and (9) Thomas Rubinsky, Esq.

### III. CONCLUSIONS OF LAW

#### A.    Monetary Sanctions

Petitioners' February 13, 2023, Motion for Sanctions precipitated these Special Master proceedings. **Ninth Cir. Case No. 22-55142, ECF No. 43.** In that motion, Petitioners asked the Ninth Circuit panel to hold THP and its attorneys jointly and severally liable for all of Petitioners' fees and expenses incurred in this

---

[12] Dallas antitrust attorney Jerry Alexander served as THP's consulting counsel in the Wyoming Antitrust Litigation though he is not counsel of record there.

litigation starting on October 28, 2021, the date on which the San Diego district court entered its fee award.[13] *Id.* **at 19–21.** The Real Parties in Interest in these proceedings were provided with notice that they too may be subject to sanctions in their individual capacity through the Special Master's Order to Show Cause and were provided with ample opportunity to be heard, both through extensive briefing and a three-and-one-half-day evidentiary hearing (including closing arguments). The Special Master concludes that monetary sanctions are appropriate as to THP and Real Parties in Interest Donald Hagans, Gregory A. Vega, and Ricardo Arias.

       1.    *Sanctions Pursuant to THP's Stipulation*

THP first stipulated to the entry of a monetary sanctions award against it on July 19, 2023, stating:

> THP is amenable to paying the reasonable fees and costs incurred by Petitioners in connection with (i) THP's application for reconsideration, filed in the District Court; (ii) the limited portion of the Ninth Circuit appeal addressing the application for reconsideration (as opposed to the appeal of the District Court's initial ruling); and (iii) Petitioners' motion for sanctions, including fees incurred in connection with this Special Master proceeding.

**Ninth Cir. Case No. 23-80039, ECF No. 22.** THP requested the opportunity to brief the "the appropriate allocation of fees incurred in connection with the Ninth Circuit appeal" and "address the reasonableness" of Petitioners' fees and costs. *Id.*

---

[13] Petitioners reiterated this position in their updated fee application filed with the Special Master on October 13, 2023. *See* **Ninth Cir. Case No. 23-80039, ECF No. 91, at 1.**

That brief was received on October 20, 2023. *See* **Ninth Cir. Case No. 23-80039, ECF No. 92.**

Notwithstanding THP's stipulation, the Ninth Circuit panel has the inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, **501 U.S. 32, 44–45 (1991).** However, given THP's stipulation, the Special Master does not find it necessary to specifically invoke the court's inherent power to justify a sanctions award against THP. When a court relies on its inherent power to impose a monetary sanction against a party, it must make a specific finding of either "(1) a willful violation of a court order; or (2) bad faith." *Am. Unites for Kids v. Rosseau*, **985 F.3d 1075, 1090 (9th Cir. 2021);** *see also Goodyear Tire & Rubber Co. v. Haeger*, **581 U.S. 101, 107 (2017) (noting that a court may order "a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side" pursuant to its inherent power).** In addition to a bad faith finding, a court ordering compensatory monetary relief must "apply a 'but-for' causation standard," tracing the compensation back to the sanctionable conduct of the party or attorney. *Am. Unites for Kids*, **985 F.3d at 1089–90.**

Here, it is likely that a monetary award against THP would be justified under the court's inherent power, specifically as a result of the misconduct of its *de facto* general counsel Donald Hagans at nearly every step of these proceedings. That said,

THP's stipulation combined with its candor to the Special Master starting with the appointment of new counsel for these proceedings makes reliance on the court's inherent power—and the attendant bad faith finding such reliance would demand—unnecessary. *Cf. Chambers*, **501 U.S. at 44 ("Because of their very potency, inherent powers must be exercised with restraint and discretion.").**

Even with THP's stipulation, there is considerable disagreement between the parties over the final sums that Petitioners are entitled to recover. On September 29, 2023, the Special Master ordered Petitioners to file an updated fee application and provided THP with an opportunity to respond. **Ninth Cir. Case No. 23-80039, ECF No. 89.** The resulting submissions center on whether certain expenses should be included in a sanctions award and, more generally, the reasonableness of GTP's expense calculations. The total amount that GTP seeks is $325,057.49. **Ninth Cir. Case No. 23-80039, ECF No. 91, at 11.**

a) *Costs and Fees from the District Court Proceedings*

First, Petitioners seek reimbursement for $34,140.00 in fees stemming from the district court proceedings. This calculation is based on the time GTP spent responding to THP's *ex parte* application for reconsideration and also on bringing a motion to enforce the district court's initial fee award after "THP steadfastly refused to pay the judgment and failed to request a stay or post a bond to obtain a stay pending appeal." **Ninth Cir. Case No. 23-80039, ECF No. 91, at 2–6.** THP argues

that Petitioners are not entitled to recover any fees associated with the motion to enforce the judgment because that dispute centered on issues wholly distinct from the "narrow issue of whether THP or its lawyers made misrepresentations to any court regarding Dennis Omanoff's cooperation with THP." **Ninth Cir. Case No. 23-80039, ECF No. 92, at 3.** Accordingly, THP submits that the $11,885 in fees associated with the motion to enforce should be excluded from the ultimate sanctions award. *Id.* **at 4.**

The Special Master agrees with THP's summation of that issue. The Ninth Circuit Appointment Order tasked the undersigned with investigating the scope of any misconduct "pertaining to the Omanoff affidavit" and recommending appropriate sanctions or disciplinary measures commensurate with his findings. **Ninth Cir. Case No. 23-80039, ECF No. 1, at 4.** Petitioners' motion to enforce the district court attorneys' fee judgment did not concern the newly discovered evidence argument or the Omanoff affidavit, and the Special Master thus does not weigh in on the propriety of THP's actions or arguments made in opposition to that motion. *See In re Yagman*, 796 F.2d 1165, 1183 (9th Cir. 1986) ("**[T]he amount of the sanctions and the manner in which they are imposed cannot be inconsistent with the purpose and directive of the authority on which the sanctions are based.**"). Accordingly, the Special Master recommends the panel reduce the amount

Petitioners seek ($34,140.00) in connection with the district court proceedings by $11,885.00, resulting in a recommended award of $22,255.00.

b) *Costs and Fees from the Ninth Circuit Proceedings*

Next, the parties disagree over whether Petitioners are entitled to recover the full amount of their fees and expenses stemming from the Ninth Circuit appeal. THP maintains that it should only have to compensate Petitioners for the fees and expenses they incurred in defending the "limited portion of the Ninth Circuit appeal" that centered on whether the information contained in the Omanoff affidavit was, in fact, newly discovered evidence under Rule 60(b)(2).[14] **Ninth Cir. Case No. 23-80039, ECF No. 22.** For their part, Petitioners argue that THP's appeal to the Ninth Circuit was entirely frivolous, entitling them to full compensation for their expenses and fees. **Ninth Cir. Case No. 23-80039, ECF No. 91, at 6–9.** Petitioners rely on Fed. R. App. P. 38 to support this request, which authorizes a court of appeals to "award just damages and single or double costs to the appellee" if it "determines that an appeal is frivolous." Ultimately, Petitioners request a reimbursement of $32,951.01. *Id.* **at 11.**

---

[14] THP presented two primary issues on appeal to the Ninth Circuit, one centered on the Omanoff affidavit as newly discovered evidence and the other challenging the district court's initial calculation of the fee award based on the Volkov firm's billing practices and time entries. *See* **Evid. Hr'g Ex. 211.**

Courts of appeal have discretion under Fed. R. App. P. 38 to order a petitioner to pay the opposing party's costs and attorneys' fees when the petitioner brings a frivolous appeal. "An appeal is frivolous 'when the result is obvious or the appellant's arguments are wholly without merit.'" ***Blixseth v. Yellowstone Mountain Club, LLC***, 796 F.3d 1004, 1007 (9th Cir. 2015) (quoting ***Glanzman v. Uniroyal, Inc.***, 892 F.2d 58, 61 (9th Cir. 1989)). But one frivolous argument, among others, cannot alone justify a fee award under Rule 38. ***See Harris v. Polskie Linie Lotnicze***, 820 F.2d 1000, 1005 (9th Cir. 1987); ***Guam Soc'y of Obstetricians & Gynecologists v. Ada***, 100 F.3d 691, 704 (9th Cir. 1996).

THP's appeal to the Ninth Circuit was not wholly without merit, and the scope of the Special Master proceedings has been confined to the newly discovered evidence argument which made up approximately one half of THP's appeal. The panel's Appointment Order that vested the undersigned with the authority to conduct these proceedings specifically concerned the "serious questions about whether the repeated representations [THP] has made in this case that Omanoff's information constituted 'newly discovered evidence that, with reasonable diligence, could not have been discovered in time,' were frivolous and/or made in bad faith." **Ninth Cir. Case No. 23-80039, ECF No. 1, at 3.** While an abuse of discretion standard of review governed THP's appeal of the district court's initial fee award (as differentiated from THP's appeal of the district court's order on the application for

reconsideration), that alone does not render the argument frivolous or wholly without merit.

Given the limited scope of the Special Master proceedings and the lack of substantive evidence that demonstrates THP's appeal was wholly frivolous, an award under Fed. R. App. P. 38 for the full amount of costs and fees GTP incurred in connection with the Ninth Circuit appeal would be inappropriate on these facts. Accordingly, the Special Master recommends that the panel reduce the amount Petitioners seek ($32,951.01) for their work on the Ninth Circuit appeal by 50%, resulting in a recommended award of $16,475.50.[15]

c) *Costs and Fees Resulting from Petitioners' Motion for Sanctions and the Special Master Proceedings*

Petitioners next seek reimbursement for $245,585.00 in attorneys' fees (and an additional $12,381.48 in costs) stemming from their work on both the Motion for Sanctions filed before the Ninth Circuit panel and the resulting Special Master

---

[15] In response to the Special Master's order for GTP to provide an updated fee application, the parties submitted a joint stipulation agreeing that "50-percent is a fair and reasonable allocation of Petitioners' costs and fees incurred during the Ninth Circuit appeal to account for their work addressing THP's so-called 'new evidence' argument." **Ninth Cir. Case No. 23-80039, ECF No. 90, at 2.** THP does not seek any further reduction of Petitioners fees and expenses from the Ninth Circuit appeal on reasonableness grounds and agrees to pay "$16,475.50 . . . for the 50% portion of the appeal focused on the application for reconsideration." **Ninth Cir. Case No. 23-80039, ECF No. 92, at 17.**

proceedings.[16] **Ninth Cir. Case No. 23-80039, ECF No. 91, at 11.** THP first challenges Petitioners' inclusion of 74.9 attorney hours, or $25,477.00, billed to work on their August 23, 2023, motion to unseal all documents that THP filed under seal. The Special Master denied Petitioners' motion on August 29, 2023, principally noting that Petitioners brought it after the taking of evidence in the Special Master proceeding had closed and finding unconvincing Petitioners' untimely arguments for why a wholesale document production or detailed privilege log was necessary. **Ninth Cir. Case No. 23-80039, ECF No. 85.**

To be sure, the fees Petitioners have incurred throughout these Special Master proceedings are substantial. And, unfortunately, they could have all been avoided had it not been for THP's repeated misrepresentations at every step of the litigation. But THP's misconduct did not give Petitioners carte blanche to run up their own fees, especially once they were under the impression that all of their work would be paid for following THP's July 19, 2023, stipulation. Courts have the "necessary discretion to adjust [attorneys' fees] awarded to address excessive and unnecessary effort expended in a manner not justified by the case." ***Ballen v. City of Redmond***, **466 F.3d 736, 746 (9th Cir. 2006).** Here, for the reasons outlined in the Special

---

[16] Petitioners note in their updated fee application that their request for $245,585.00 includes all fees incurred up to and including September 30, 2023. **Ninth Cir. Case No. 23-80039, ECF No. 91, at 9–10.** They have further indicated that they are continuing to record fees incurred after that date and will "submit those to the Ninth Circuit at the appropriate time." *Id.* **at 10.**

Master's order denying Petitioners' motion to unseal, **Ninth Cir. Case No. 23-80039, ECF No. 85**, the Special Master concludes that those expenses were unnecessarily incurred. The Special Master therefore recommends the panel reduce the amount Petitioners seek ($245,585.00) in connection with their motion for sanctions and the Special Master proceedings by $25,477.00, for a recommended award of $220,108.00 plus an additional $12,381.48 in expenses, subtotaling $232,489.48.

Taking into account the above reductions, the Special Master is left with the following amounts in connection with Petitioners' updated fee application: (1) $22,255.00 for Petitioners' work opposing THP's *ex parte* application in the district court; (2) $16,475.50 for Petitioners' work on the limited portion of the Ninth Circuit appeal focused on the newly discovered evidence argument; (3) $220,108.00 for Petitioners' work on their motion for sanctions and the resulting Special Master proceedings; and (4) $12,381.48 in expenses from the Special Master proceedings. This results in a recommendation to the Ninth Circuit panel that it grant an award of $271,219.98, prior to any further reductions discussed below.

### d) *Reasonableness of the Various Calculations*

THP requests further reductions on the amounts listed as (1) and (3) above. Specifically, THP argues that the attorneys' fees Petitioners claimed to have incurred in connection with their work on the *ex parte* application for reconsideration and,

later, on the motion for sanctions and Special Master proceedings are both inflated and impossible to parse because of what it calls Petitioners' "block billing" practices. Accordingly, they seek a 40% reduction on those amounts. **Ninth Cir. Case No. 23-80039, ECF No. 92, at 16.**

In calculating fee awards, judges are instructed to scrutinize the "reasonableness of (a) the number of hours expended and (b) the hourly fee claimed." *Long v. I.R.S.*, **932 F.2d 1309, 1314 (9th Cir. 1991).** THP challenges the hours expended but not the hourly rates of the Volkov firm's attorneys. Having considered the parties' submissions in response to the Special Master's order for Petitioners to submit an updated fee application, the Special Master concludes that the total number of hours Petitioner expended on its work in the district court and, later, before the Special Master are somewhat inflated and justify a modest adjustment. *Cf. Yagman*, **796 at 1184–85 (observing that sanctions awards based on attorneys' fees need not "rigidly apply the factors" that apply to loadstar fee calculations, provided that the court makes an "evaluation of the fee breakdown submitted by counsel" to assess the reasonableness of that breakdown).**

THP has submitted comparisons between the attorney hours it spent on various stages of this litigation and the attorney hours Petitioners claim to have spent on the same. For example, THP notes that it spent approximately 17% less time on

the Special Master proceedings than Petitioners. *See* **Ninth Cir. Case No. 23-80039, ECF No. 92, at 14.** Moreover, THP notes that Petitioners seek reimbursement for significant amounts of attorney time in connection with both their opening brief and preparation for closing argument, which had fifteen-page and twenty-minute argument caps, respectively. *Id.* With respect to Petitioners August 23, 2023, motion to unseal, THP trenchantly notes that Volkov attorneys billed 74.9 hours to that "uncomplicated 16-page motion" compared to their own attorneys billing a mere 16.7 hours in their successful opposition to the same.[17] *Id.* **at 11.** Finally, the Special Master recognizes that any incentive Petitioners may have had to mitigate their fees in connection with the Special Master proceedings was significantly lessened following THP's stipulation on July 19, 2023.

Based on these, and other considerations, the Special Master recommends that the panel reduce Petitioners' fees for their work on the *ex parte* application, motion for sanctions, and Special Master proceedings by 10%, a "haircut." ***See Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) ("[C]ourt[s] can impose a small reduction, no greater than 10 percent—a 'haircut'—based on [their] exercise of discretion and without a more specific explanation.").** This figure

---

[17] Although the Special Master has already recommended, *supra*, excluding the time billed to this motion from the amount Petitioners seek in connection with their motion for sanctions and the Special Master proceedings, it nonetheless serves as a useful example of excessive billing practices present in this case.

accounts for the concerns raised in THP's response to Petitioners' fee application without unduly prejudicing Petitioners in their pursuit for reimbursement of fees that they never would have incurred in the first place but for THP's misconduct.

In summary, the Special Master recommends the panel impose a grand total sanction award of **$246,983.68** against THP, comprised of the following individual amounts: (1) $20,029.50 for Petitioners' work opposing THP's *ex parte* application in the district court (incorporating a 10% reduction); (2) $16,475.50 for Petitioners' work on the limited portion of the Ninth Circuit appeal focused on the newly discovered evidence argument; (3) $198,097.20 for Petitioners' work on their motion for sanctions and the resulting Special Master proceedings (incorporating a 10% reduction); and (4) $12,381.48 in expenses from the Special Master proceedings.

This total recommended monetary award is set forth in table form here for the convenience of the panel.

| Separate Bases of Recovery | Amount |
|---|---|
| Fees associated with THP's *ex parte* application for reconsideration | $20,029.50 |
| 50% of the fees from the Ninth Circuit appeal | $16,475.50 |

| Fees from Petitioners' motion for sanctions and the Special Master proceedings | $198,097.20 |
|---|---|
| Expenses from the Special Master proceedings | $12,381.48 |
| **Total:** | **$246,983.68** |

2. *Individual Attorney Sanctions for the Unreasonable and Vexatious Multiplication of Proceedings*

28 U.S.C § 1927[18] vests United States courts with the power to hold attorneys personally liable for fees and costs incurred by the other side as a result of their misconduct. The statute authorizes the imposition of sanctions against "any lawyer who wrongfully proliferates litigation proceedings once a case has commenced." ***Pac. Harbor Cap., Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1117 (9th Cir. 2000).** Courts wishing to impose sanctions under § 1927 must make a finding that

---

[18] 28 U.S.C. § 1927 provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

the attorney to be sanctioned acted with "subjective bad faith." *New Alaska Dev. Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989).

Section 1927 is the chief statutory tool by which a court can hold individual attorneys liable for misconduct. It does not apply to law firms, clients, corporations, or other entities. *See Kaass Law v. Wells Fargo Bank, N.A.*, 799 F.3d 1290, 1293 (9th Cir. 2015). However, § 1927's language is also broad in that it can reach "*any* attorney or other person admitted to conduct cases in *any court* of the United States" provided they personally "multiply the proceedings in any case unreasonably and vexatiously." **(emphasis added).** The plain language of the statute thus supports the conclusion that the attorneys of record for a specific client do not represent the entire universe of individuals who may be sanctioned pursuant to § 1927. This nuance is important in these proceedings given the number of different attorneys who formally represented or otherwise counseled THP through the various stages of this litigation and those attorneys' various bar admissions.

To find that the Ninth Circuit panel in this case could only sanction the attorneys who are licensed to practice before the Ninth Circuit and who did in fact represent THP before the court would be irreconcilable with the logic of § 1927. The statute targets conduct that "multiplies the proceedings in any case," which fairly encompasses conduct that results in a petition for review with a court of appeals or, indeed, the appointment of a Special Master to conduct additional fact-

finding.  **28 U.S.C. § 1927.**  When an attorney raises a frivolous argument with the district court, and that issue is later appealed and re-argued to the Ninth Circuit by a different attorney, the original attorney can still be sanctioned under § 1927 for their role in multiplying the proceedings.  ***See, e.g.*, *Boyer v. BNSF Ry. Co.*, 832 F.3d 699, 701 (7th Cir. 2016) (noting that a § 1927 sanction is likely still appropriate when it relates to conduct that happened to occur before a different court because those earlier proceedings were procedurally connected to the "instant litigation" before the sanctioning court); *Raymark Indus. v. Baron*, 1997 WL 359333, at \*7 n.10 (E.D. Pa. June 23, 1997) ("The purpose of § 1927 is frustrated by the imposition of sanctions in two distinct *cases*, not in two different *courts*." (emphasis added)).**  Likewise, a party's attorney who reviews and approves motions, applications, and briefs filed in a case is responsible for the resulting multiplication of proceedings even when he does not sign his name to those filings or personally argue them before the court.

Accordingly, the Special Master concludes that all of the attorneys involved in the instant litigation may be eligible for imposition of sanctions under § 1927. The remaining Real Parties in Interest who meet this criterion are Donald Hagans, Gregory A. Vega, Ricardo Arias, and Marina A. Torres.[19]  Megan Overmann Goetz

---

[19] Each of these individuals is an "attorney. . . admitted to conduct cases in any court of the United States."  **28 U.S.C. § 1927.**  Donald Hagans testified that he is admitted

does not meet this criterion. She has focused exclusively on the Wyoming Antitrust Litigation and was not involved in the litigation before the San Diego district court or the Ninth Circuit. The full scope of her involvement in these proceedings relates to her filing one declaration before the Special Master, discussed *supra*, and participating in the in-person evidentiary hearing. For the reasons set forth below, the Special Master concludes that § 1927 sanctions are appropriate only as to attorneys Hagans, Vega, and Arias.

But for Vega and Arias's motion for reconsideration, which spawned the utterly meritless newly discovered evidence argument that was made in at least five different stages of this litigation, we would not be here today. "While, '[o]ur cases have been less than a model of clarity regarding whether a finding of mere recklessness alone may suffice to impose sanction[s] for attorneys' fees' under § 1927," it is plainly clear that "a finding that the attorneys recklessly raised a *frivolous* argument which resulted in the multiplication of the proceedings" justifies § 1927 sanctions. ***In re Girardi*, 611 F.3d 1027, 1061 (9th Cir. 2010) (alteration**

---

in the State of Texas and U.S. District Court for the Western District of Texas. **Evid. Hr'g Tr. vol. 3, 758 (Testimony of Donald Hagans).** Gregory A. Vega testified that he is admitted to practice in the State of California, the Ninth Circuit, and various other state and federal courts. **Evid. Hr'g Tr. vol. 2, 411–12 (Testimony of Gregory Vega).** Ricardo Arias testified that he is admitted to practice in the State of California and in three of the U.S. District Courts in California. **Evid. Hr'g Tr. vol. 2, 540 (Testimony of Ricardo Arias).** Finally, Marina A. Torres testified that she is admitted to practice in the State of California, the Ninth Circuit, and several other federal courts. **Evid. Hr'g Tr. vol. 3, 630 (Testimony of Marina Torres).**

REPORT AND RECOMMENDATION                                    Page 77 of **102**

and emphasis in original) (quoting ***B.K.B. v. Maui Police Dep't***, 246 F.3d 1091, 1107 (9th Cir. 2002)); *see also In re Keegan Mgmt. Co., Secs. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996) ("**Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument."** (internal citations and quotation marks omitted)).** Gregory A. Vega and Ricardo Arias easily satisfy this recklessness bad faith standard with respect to the frivolous Fed. R. Civ. P. 60(b)(2) argument that they submitted to the San Diego district court as part of their application for reconsideration.

We have characterized frivolous arguments for the purposes of § 1927 sanctions as ones that are "baseless and made without reasonable and competent inquiry" or made up of "legal or factual contentions so weak as to constitute objective evidence of improper purpose." ***Girardi*, 611 F.3d at 1062 (internal citations and quotation marks omitted).** That is to say that when an argument is patently lacking in any basis in either law or fact, it can be fairly characterized as "frivolous" for the purpose of a § 1927 sanction award.

The argument that Ricardo Arias first concocted based on a cursory reading of Fed. R. Civ. P. 60(b)(2) is a poster child for the definition of a frivolous argument. Arias knew that Omanoff began cooperating with TPW in May 2021. He received multiple draft Omanoff affidavits in May, some as long as twelve pages in length, and his supervising partner Gregory A. Vega testified during the Special Master

proceedings that the May and June Omanoff affidavits were "substantially similar" to the one they received from Hagans in October. **Evid. Hr'g Tr. vol. 2, 444 (Testimony of Gregory Vega).**

Had Arias read just one or two cases interpreting the meaning of "newly discovered evidence" or "reasonable diligence," he would have known that his Fed. R. Civ. P. 60(b)(2) argument was frivolous. But he did not conduct *any* further research into the meaning of the rule. He merely searched "motion for reconsideration," stumbled upon Rule 60(b)(2), and added it as a primary argument in his draft application for reconsideration. *See* **Evid. Hr'g Tr. vol. 2, 556–60, 569, 613 (Testimony of Ricardo Arias).** Compounding Arias's culpability is the fact that he copied and pasted the language from the shelved May 2021 draft application for reconsideration into the November application that was eventually filed with the San Diego district court and conveniently changed the date on which Omanoff "came forward" from May 24, 2021, to October 29, 2021. **Evid. Hr'g Tr. vol. 3, 600–01 (Testimony of Ricardo Arias).** Arias's failure to conduct any inquiry into the applicability of Fed. R. Civ. P. 60(b)(2), combined with his unilateral decision to recycle old information and make it new, constitutes ample evidence of both recklessness and frivolousness as a matter of law.

Like Arias, Vega was fully aware of the scope of Omanoff's cooperation with Hagans and TPW starting in May 2021. When Arias sent him the draft *ex parte*

application for reconsideration, riddled with misstatements of law and fact, he did nothing to correct the errors. He testified on the stand that he simply accepted the argument that Arias set forth in the application, that Fed. R. Civ. P. 60(b)(2) applied because the Omanoff information would be "new to Judge Whelan." **Evid. Hr'g Tr. vol. 2, 451, 507 (Testimony of Gregory Vega).** As the supervising partner on the THP matter, Vega cannot escape liability or accountability on account of Arias's exceptionally poor performance in researching and preparing the application for reconsideration. To Vega's credit, he does not attempt to do so. Indeed, he testified before the Special Master that he accepted full responsibility for the misrepresentations made in the application for reconsideration. *Id.* **at 452–53, 455.** The Special Master accepts and appreciates the concession.

In the end, Vega signed his name to the *ex parte* application for relief, and eventually, to the Notice of Appeal to the Ninth Circuit. His failure to check Arias's work and independently verify the facts and law included in the application for reconsideration rise to the level of recklessness. Even without further research into Fed. R. Civ. P. 60(b)(2), Vega, as the responsible partner, should have seen and corrected the clear misstatement in the application for reconsideration that "[o]n **October 29, 2021, after this Court issued its Order**, Dennis Omanoff . . . **came forward** alleging unethical and illegal conduct by Volkov." **Evid. Hr'g Ex. 301**

**(emphasis added).** Vega's recklessness in filing frivolous arguments before the San Diego district court led to the multiplication of these proceedings.

Arias's and Vega's conduct in preparing and filing the *ex parte* application for reconsideration with the San Diego district court was, at a minimum, reckless and, as discussed, their newly discovered evidence argument was wholly frivolous. Moreover, the Special Master has recounted above that Vega and Arias failed to correct any of the misstatements of law or fact that they caused to be filed with the San Diego district court and the Special Master. These repeated failures were a substantial and motivating factor in the resulting appeal, petition for panel rehearing, motion for sanctions, and Special Master proceedings. These failures constitute bad faith and justify the imposition of a substantial sanction award under § 1927.

Despite Vega's and Arias's role in spawning the newly discovered evidence argument, outside general counsel Donald Hagans lies at the center of the "complex web of misrepresentations made to various courts." **Ninth Cir. Case No. 23-80039, ECF No. 31.** He bears significant responsibility for allowing the frivolous argument to be made in the first instance and then repeated to multiple federal judges throughout these proceedings. He too should be sanctioned under § 1927.

First, Hagans's conduct is sanctionable under § 1927 because he rubber-stamped the newly discovered evidence argument in the first place. *See* **Evid. Hr'g Ex. 316.** Second, where Judge Whelan correctly surmised that THP knew most, if

not all, of the Omanoff information well before October 29, 2021, based on filings in the Wyoming Antitrust Litigation, Hagans knew THP had all of the Omanoff information *for a fact* based on his personal role in soliciting and documenting that information beginning in May 2021. Despite this knowledge, Hagans pressed forward with an appeal to the Ninth Circuit, including the newly discovered evidence argument, and failed to inform Marina A. Torres of the full scope of his interactions with Omanoff, even when she was tasked with responding to Petitioners' motion for sanctions.

Even if Hagans's testimony is true that he only became aware of the fact that the Rule 60(b)(2) argument was false and misleading during the course of the Special Master proceedings, *see* **Evid. Hr'g Tr. vol. 3, 785–87 (Testimony of Donald Hagans)**, it does not diminish his culpability. Nor do Hagans's repeated assertions that he "bought the Kool-Aid" with respect to the Rule 60(b)(2) argument, *see id.* **at 816,** or that his actions were somehow justified because THP and GTP were engaged in a "war" with one another, *see* **Evid. Hr'g Tr. vol. 4, 987 (Testimony of Donald Hagans)**. As Hagans himself acknowledged, as an attorney for THP, it was his responsibility to ensure the veracity of the arguments he was approving on the company's behalf. **Evid. Hr'g Tr. vol. 3, 787 (Testimony of Donald Hagans).** He recklessly failed to fulfill that professional obligation time and again. Each time he did so led to new appeals, new motions, new evidentiary submissions resulting in

the need for an extended evidentiary hearing, which multiplied the proceedings and caused Petitioners to incur still more fees in their attempt to defend against frivolous arguments. His actions in this litigation warrant a substantial sanction award under 28 U.S.C. § 1927.

Finally, the Special Master has concluded that although Marina A. Torres personally submitted frivolous arguments to the Ninth Circuit and Special Master, she did not act with the requisite bad faith—i.e., recklessness—necessary to justify monetary sanctions under § 1927.

Unlike Vega, Arias, and Hagans, Torres had no personal knowledge of the communications between Hagans and Omanoff in May and June of 2021. At no point while she was preparing the opening brief for the Ninth Circuit appeal did Hagans or anyone else alert her to the fact that THP had access to the information contained in the October Omanoff affidavit any earlier than was represented to the district court. Finally, Torres stands alone in exercising reasonable diligence and competence in attempting to ensure the veracity of the claims she was making in her opposition to GTP's motion for sanctions. *See* **Evid. Hr'g Exs. 623, 624, 626, 627, 628.** Despite these efforts, Hagans, Vega, and Arias, all confirmed that everything represented in the *ex parte* application for reconsideration was correct, particularly concerning the timing of when they received the Omanoff information. *Id.*

Petitioners argue that Torres still acted in bad faith because she had access to the district court order denying THP's application for reconsideration, the public docket in the Wyoming Antitrust Litigation, and the substantive arguments in their own briefs. True enough. While this information likely should have caused Torres to probe deeper into the factual basis for the newly discovered evidence argument, particularly in the early days of the appeal, the Special Master concludes that she did not act recklessly in raising the argument on appeal.

At worst, Torres acted negligently. In *Blixseth*, the court addressed the conduct of several attorneys who were "involved to varying degrees" in pressing their client's frivolous appeal. ***Blixseth v. Yellowstone Mountain Club, LLC*, 796 F.3d at 1008.** In response to an order to show cause, the attorneys argued there was some support for their theory on appeal, that they acted in good faith, and that they each had limited roles in the appeal. *Id.* The court specifically noted that each of the attorneys still "allowed their names to be placed on briefs that presented frivolous and inflammatory arguments," but that their conduct did not rise to the level of bad faith, which led the court to not impose Fed. R. App. P. 38 sanctions on any of the individuals. *Id.* Like the attorneys in *Blixseth*, Torres allowed her name to be placed on briefs that presented frivolous arguments on appeal. But also like those attorneys, she acted in good faith, relying on the available information that she had both from her client and THP's *qui tam* counsel. She thus did not act in bad faith, and the

Special Master concludes, at least with respect to monetary sanctions, that the observations in this Report and Recommendation "will serve as a sufficient warning to [her] to act more responsibly in the future." *Id.*

In summary, the Special Master concludes that Real Parties in Interest Donald Hagans, Gregory A. Vega, and Ricardo Arias acted with subjective bad faith by recklessly raising frivolous arguments before various federal courts, leading to the unreasonable and vexatious multiplication of these proceedings thereby justifying individual monetary sanctions under 28 U.S.C. § 1927.[20] Specifically, the Special Master recommends holding Donald Hagans jointly and severally liable with THP for 50% of the ultimate sanction award the panel decides upon, Gregory A. Vega jointly and severally liable with THP for 20% of the ultimate sanction award the panel decides upon, and Ricardo Arias jointly and severally liable with THP for 10% of the ultimate sanction award the panel decides upon. If the panel adopts the Special Master's recommendations above with respect to THP's liability pursuant to its

---

[20] The Special Master also concludes that Hagans, Vega, and Arias were all afforded ample procedural due process protections, including reasonable notice and an opportunity to be heard. *See Pac. Harbor Cap., Inc. v. Carnival Air Lines, Inc.*, **210 F.3d at 1118.** An evidentiary hearing plainly satisfies the due process requirements for § 1927 sanctions, as does the opportunity to "brief the issue fully." *Id.* All three attorneys were ordered to show cause why they should not face individual sanctions, had the opportunity to respond in writing to that show-cause order, and participated in a three-and-one-half-day evidentiary hearing before the Special Master in Coeur d'Alene, Idaho.

stipulation, this would result in total individual liability not to exceed $123,491.84 for Hagans, $49,396.74 for Vega, and $24,698.37 for Arias.

## B. Individual Attorney Discipline

Petitioners did not request that the Ninth Circuit panel impose disciplinary sanctions on any of THP's individual attorneys as part of their motion for sanctions. However, the panel specifically contemplated that individual discipline may be appropriate based on the information available to it at the time of its March 30, 2023, appointment order authorizing the undersigned to conduct these proceedings. *See* **Ninth Cir. Case No. 23-80039, ECF No. 1, at 3–4 (quoting 9th Cir. G.O. 12.9(a); then citing Fed. R. App. P. 46(b); and 9th Cir. R. 46-2) ("[W]e may sanction 'counsel or a party for conduct that violates the Federal Rules of Appellate Procedure, the Circuit Rules, orders or other instructions of the Court, the rules of professional conduct or responsibility in effect where counsel maintains his or her principal office or as authorized by statute.'").**

When the Special Master finally became aware of the full scope of Omanoff's cooperation as a result of THP's July 19, 2023, filings, the Special Master gave adequate notice to the Real Parties in Interest that he was considering recommending individual discipline to the Ninth Circuit panel. *See* **Ninth Cir. Case No. 23-80039, ECF 31, at 3 ("[Q]uestions remain as to whether the materially misleading arguments and representations were made knowingly, recklessly, or**

**unwittingly. The Special Master therefore hereby ORDERS Respondent [THP] and counsel acting on its behalf TO SHOW CAUSE, if any they have, why sanctions should not be imposed.").**

Again, the remaining five individual attorneys who are Real Parties in Interest to this matter are admitted to a wide assortment of state and federal bars. Only two—Gregory A. Vega and Marina A. Torres—are admitted to practice before the Ninth Circuit. These diverse bar admissions have a significant impact on the panel's options for individual attorney discipline in this case.

### 1. *Gregory A. Vega and Marina A. Torres*

As the two attorneys licensed to practice in the Ninth Circuit, the panel has power to discipline both Vega and Torres under the Federal Rules of Appellate Procedure. Fed. R. App. P. 46(b) & (c), provides that a member of the Ninth Circuit bar may be subject to suspension, disbarment, or other discipline for "conduct unbecoming a member of the court's bar." The Supreme Court has noted that the "conduct unbecoming" standard "reflects the burdens inherent in the attorney's dual obligations to clients and to the system of justice." *In re Snyder*, **472 U.S. 634, 644 (1985).** Conduct unbecoming is defined as "conduct contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice." *Id.* **at 645.** The Ninth Circuit has found that a "lack of diligence that impairs the deliberations of the

court is sufficient" to impose discipline under Fed. R. App. P. 46.  **Girardi, 611 F.3d at 1035 (citing Gadda v. Ashcroft, 377 F.3d 934, 947 (9th Cir. 2004)); see also DCD Programs Ltd. v. Leighton, 846 F.2d 526, 528 (9th Cir. 1988); In re Hanson, 572 F.2d 192, 193 (9th Cir.  1977).**

Consistent with Supreme Court direction, the Ninth Circuit has found that attorneys demonstrate "conduct unbecoming of the court's bar" when they violate applicable rules of professional conduct, including both the ABA model rules and the rules of professional conduct "adopted by the licensing authority of an attorney's home state."  **Snyder, 472 U.S. at 645 n.6; see Girardi, 611 F.3d at 1035.**  Further, it is appropriate for a circuit court imposing discipline under Fed. R. App. P. 46 to consider the ABA's Standards for Imposing Lawyer Sanctions.  **See Girardi, 611 F.3d at 1035–36; United States v. Swanson, 943 F.2d 1070, 1076 (9th Cir. 1991); ABA Joint Comm. on Prof'l Standards, Standards for Imposing Lawyer Sanctions (1984, rev. 1992) ("ABA Standards").**

Both Vega and Torres are licensed to practice in their home state of California and are thus bound by the California Rules of Professional Conduct.  The California Rules prohibit attorneys from "knowingly mak[ing] a false statement of fact or law to a tribunal or fail[ing] to correct a false statement of material fact or law previously made to the tribunal."  **Cal. R. Prof. Conduct 3.3(a)(1); see also Model R. Prof. Conduct 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or**

**controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.").**

As outlined in the above section related to § 1927 sanctions, Vega's conduct in approving Arias's draft of the *ex parte* application for reconsideration demonstrated recklessness that resulted in materially false statements of law and fact to be filed with the San Diego district court. Regardless of whether Vega acted with actual knowledge of the falsity of his claims, it is abundantly clear that he demonstrated an extreme lack of diligence in reviewing and approving Arias's draft application for reconsideration. As the supervising partner on the matter, Vega had an affirmative professional obligation to ensure that the claims being made in the application for reconsideration were not frivolous, especially considering that Arias was only a third-year associate in 2021.

Vega's misconduct extends beyond his role in filing the application for reconsideration. First, the Special Master has concluded that he did nothing of substance to alert Hagans to the fact that the newly discovered evidence argument had no merit following Judge Whelan's order denying the application for reconsideration. Indeed, Vega signed his name to the Notice of Appeal to the Ninth Circuit, where that frivolous argument was made for a second time to the panel assigned to the case. ***See* Evid. Hr'g Ex. 634.** Second, when Marina A. Torres

asked for his firm's assistance concerning the arguments Petitioners made in their motion for sanctions, he did nothing to alert her to the fact that he and Arias *had* in fact received several draft Omanoff affidavits in May 2021. Third, before the Special Master, THP filed an Opening Brief that falsely stated, "the May 2021 affidavit was prepared solely in connection with the Wyoming Suit and was not provided to THP's counsel in the *qui tam* case." **Evid. Hr'g Ex. 217, at 5–6.** Vega supplied a declaration under the penalty of perjury in support of that Opening Brief in which he maintained that his firm had no role in preparing the October Omanoff affidavit and that Arias never made any misrepresentations to the district court. **Evid. Hr'g Ex. 312, at ¶¶ 4, 6, 9.** As evidenced by the discussion thus far, these statements were false.

Vega's explanations for his actions, particularly with respect to his conduct and misleading statements to the Special Master, are entirely unconvincing and do little, if anything, to mitigate his culpability. All of this adds up to a substantial deviation from the relevant codes of professional conduct to which Vega was bound. While Vega has had a long and honorable career, and has never before been subject to individual sanctions, in some ways this lengthy litigation experience serves as an aggravating factor. *See Girardi*, **611 F.3d at 1039 (citing *ABA Standards* § 9.22(i)).** Simply put, Vega should have known better. His misconduct in part caused these proceedings to extend far longer than they should have, and the misleading Rule

60(b)(2) issue to snowball from a "throw it at the wall and see what sticks" approach to a tangled web of deceit. **See DCD Programs, 846 F.2d at 528 (finding discipline appropriate under Fed. R. App. P. 46 when an attorney's misrepresentations to the court went to the "heart of the appeal").**

Our decision in *Girardi*, to suspend two attorneys from practice before the circuit for six months following comprehensive special master proceedings is instructive. But unlike the suspended attorneys in *Girardi*, who were involved in the litigation from start to finish and personally responsible for their own frivolous argument having been filed on appeal and before numerous federal judges, Vega's role in this litigation was more limited. **See Girardi, 611 F.3d at 1039.** Vega was not intimately connected to the appeal, did not draft or personally approve subsequent iterations of the newly discovered evidence argument, and was not involved in the actual drafting of THP's Opening Brief before the Special Master. Furthermore, Vega was honest and contrite during the evidentiary hearing, not seeking to defend his misconduct but instead taking responsibility for it, especially as it concerns reviewing Arias's work. While the Ninth Circuit determined that the appropriate sanction for the two attorneys in *Girardi* was a six-month suspension from practice before the Ninth Circuit, the Special Master concludes that a lesser sanction is appropriate for Vega, and formally recommends a public reprimand under the Court's discretionary authority pursuant to Fed. R. App. P. 46(c).

As for Marina A. Torres, the Special Master has found that she was a party of one in conducting some level of due diligence in response to Petitioners' motion for sanctions. Again, Hagans, Vega, and Arias acted with reckless disregard for the truth in their communications with Torres surrounding THP's response to that motion. However, Torres's actions during the early stages of the appeal merit some discussion in the context of whether she should face any individual discipline.

On the one hand, there were several red flags in the district court record that should have alerted Torres to the frivolousness of the newly discovered evidence argument. For one, she had access to Judge Whelan's order denying THP's *ex parte* application for reconsideration, which, knowing what the Special Master now knows, all but "laid bare the fundamental and fatal flaws" with THP's newly discovered evidence argument. ***Girardi*, 611 F.3d at 1036–37 (noting that a well-reasoned district court opinion should have given attorneys "pause in pursuing an appeal").** She also had access to the Wyoming Antitrust Litigation docket, on which Judge Whelan relied heavily in his order, but testified to the Special Master that she did not thoroughly review the pleadings in that matter. **Evid. Hr'g Tr. vol. 3, 714 (Testimony of Marina Torres).** This information alone should have set off substantial alarm bells for Torres with respect to the newly discovered evidence argument.

On the other hand, Torres provided credible evidence that she contacted THP's *qui tam* counsel and had substantial conversations with Donald Hagans before filing THP's opening brief. While it is not clear what the precise contours of those conversations were, it is clear that Hagans, Vega, and Arias never informed Torres that they had direct knowledge of the Omanoff information that served as the basis for the newly discovered evidence argument as early as May 2021. Moreover, Torres provided her draft Opening Brief and Petition for Panel Rehearing to Hagans for review. On both occasions, he approved the filings without revisions, despite the fact that he knew all of the relevant facts that today demonstrate the utter frivolousness of THP's newly discovered evidence argument.

While not directly applicable to Torres's efforts, Fed. R. Civ. P. 11 provides helpful guidance on whether those efforts constituted a reasonable inquiry into the facts of THP's case while preparing the appeal. For one, the advisory committee notes caution courts from "using the wisdom of hindsight" in making reasonable inquiry determinations and state that the determination depends on a number of factors, including whether an attorney "depended on forwarding counsel or another member of the bar" in preparing a pleading. **Fed. R. Civ. P. 11 advisory committee's note to 1983 amendment;** *see also Townsend v. Holman Consulting Corp.***, 929 F.2d 1358, 1364 (9th Cir. 1990);** *Miller v. Bittner***, 985 F.2d 935, 939 (8th Cir. 1993).** Federal courts have also found that the reasonableness of an

attorney's inquiry also depends on "the extent of the attorney's reliance upon his client for the factual support for the document." ***Thomas v. Cap. Sec. Servs., Inc.*, 836 F.2d 866, 875 (5th Cir. 1988); *see, e.g.*, *Davis v. Crush*, 862 F.2d 84, 88 (6th Cir. 1988).**

Against this backdrop, the reasonableness of Torres's inquiry fairly implicates her lack of first-hand knowledge and the extent to which she had to rely on her client and trial counsel to provide her with the facts necessary to prepare THP's appeal. It is thus difficult for the Special Master to conclude that Torres demonstrated "conduct unbecoming of the court's bar" when the only people who could have informed her about the full scope of Omanoff's cooperation never did so when she asked. She indeed demonstrated some poor judgment, particularly in failing to consider Judge Whelan's decision more carefully and forcefully tripling and quadrupling down on the newly discovered evidence argument in THP's petition for panel rehearing and opposition to Petitioners' motion for sanctions despite a number of red flags. However, the surrounding circumstances and relative culpability of other Real Parties in Interest—i.e., Hagans, Vega, and Arias—provides crucial context for her actions.

Accordingly, the undersigned does not recommend the panel impose any individual disciplinary sanctions against Ms. Torres under Fed. R. App. P. 46 and

believes the facts set forth in this Report & Recommendation will cause her to work up her appeals more carefully in the future.

### 2. *Donald Hagans, Ricardo Arias, and Megan Overmann Goetz*

The remaining Real Parties in Interest are Donald Hagans, Ricardo Arias, and Megan Overmann Goetz, none of whom are admitted to practice in the Ninth Circuit, thus placing them beyond the reach of Fed. R. App. P. 46. The Court does have broad inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, **501 U.S. at 44–45.** The inherent power is potent, extending not only to conduct occurring before the court but also to "actions beyond the court's confines, regardless of whether that conduct interfered with courtroom proceedings." *Am. Unites for Kids*, **985 F.3d at 1088.** However, the Supreme Court explained in *Goodyear Tire & Rubber Co. v. Haeger*, **581 U.S. 101, 108 (2017)**, that when an inherent power sanction is punitive rather than compensatory, the court must "provide procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof."

We unequivocally recognized the need to distinguish between compensatory and punitive sanctions when leveraging our inherent power in *Am. Unites for Kids*, **985 F.3d at 1089.** There, we observed that punitive sanctions are often those "intended to vindicate the court's authority and the integrity of the judicial process." *Id.* (quoting *F.J. Hanshaw Enterprises, Inc. v. Emerald River Dev., Inc.*, **244 F.3d**

**1128, 1138 (9th Cir. 2001)).** Attorney discipline is one such sanction, and thus requires heightened criminal-level due process protections, including the appointment of an independent prosecutor.

Given that these heightened levels of due process protections did not exist during the Special Master proceedings, the undersigned counsels the panel against relying on its inherent power to directly discipline any of the remaining Real Parties in Interest.[21] Instead, the Special Master recommends referring this matter to the appropriate State Bars and federal district courts for their consideration of any possible disciplinary proceedings.

The Findings of Fact included herein demonstrate Donald Hagans's dereliction of duty and patent misconduct at virtually every step of this litigation, from approving frivolous filings, to withholding material information from THP appellate counsel, to repeated obfuscation during the Special Master proceedings. While various counsel for THP changed throughout the duration of the underlying litigation, Hagans's role as the company's *de facto* general counsel overseeing all corporate legal matters did not. Out of all the misconduct discovered in this case, Hagans's behavior is, by far, the most offensive. Had he been admitted to practice

---

[21] Alternatively, if the panel disagrees, the panel could consider the appointment of a Special Prosecutor to conduct disciplinary proceedings for a more limited subset of the remaining Real Parties in Interest. Such proceedings would comport with the criminal-level due process protections required in these circumstances. The Special Master is not making that recommendation here.

before the Ninth Circuit, the undersigned would have recommended a substantial period of suspension from practice before the court under Fed. R. App. P. 46(b), if not outright disbarment.

Accordingly, the Special Master recommends the panel certify a copy of this Report & Recommendation to the Texas State Bar for its consideration of any disciplinary proceedings focused on Hagans's clear violations of the rules of professional conduct to which he is bound as an officer of the court.

As detailed in the Findings of Fact and in connection with the Special Master's discussion of § 1927 sanctions, *supra*, Ricardo Arias's conduct is deeply troubling. Especially as a relatively young attorney, Arias cannot afford to make a habit out of the egregious research practices he demonstrated in this case. Accordingly, the Special Master recommends the panel certify a copy of this Report & Recommendation to the California State Bar and to Judge Thomas Whelan in the Southern District of California for further disciplinary proceedings focused on his clear violations of the rules of professional conduct to which he is bound as an officer of the court.

Finally, Megan Overmann Goetz's conduct in this matter was not a model of good lawyering. As detailed in the Findings of Fact above, her declaration in support of THP's Opening Brief to the Special Master mischaracterized her involvement in the development of various Omanoff affidavits and demonstrated a lack of diligence

in informing herself of the nature of the Special Master proceedings before submitting a misleading statement in the case under the penalty of perjury. However, the Special Master recognizes that Goetz did not personally draft that declaration and provided limited edits to it before THP's Special Master counsel filed it with the court. Moreover, her declaration stands out as troubling in part due to the long list of other, similar misstatements in this case, over which she had no knowledge or control.

Additionally, the Special Master commends Ms. Goetz for her role in producing a May 2021 Omanoff affidavit that finally caused THP to bring the full scope of Omanoff's cooperation to the Special Master's attention and for her honesty and contrition throughout these proceedings. The Special Master cautions Ms. Goetz to take more care in the future but does not recommend that the panel refer her to any of the bars to which she is admitted for further proceedings. That said, the Special Master recommends the panel certify a copy of this Report & Recommendation to United States District Judge Alan B. Johnson in the District of Wyoming to consider whether the statements made before him warrant any further investigation.

## IV. SUMMARY OF RECOMMENDATIONS

This case demonstrates that the line between "zealous advocacy" and misrepresentations to the court can become easily blurred in the eyes of many

members of the bar. While the Special Master has not concluded that any of the actors involved in this litigation acted with malice or the specific intent to defraud the court, many of them nonetheless disregarded their professional obligations—set forth in Rule 11, statutory law, and various applicable codes of professional conduct—under the guise of litigation strategy and vigorous client defense to influence decision-making by federal judges. The court has an obligation to itself and, more importantly, to the public at large to protect against the kind of misconduct replete in this record. As a result, Respondent THP and some of its individual attorneys should face monetary sanctions and individual discipline for their misconduct.

First, the Special Master recommends to the panel that the following entities and individuals be required to reimburse Petitioners for the fees, costs, and expenses incurred as a result of their misconduct.

1. Pursuant to its stipulation, Respondent THP should be held liable to Petitioners for $246,983.68 of their reasonable attorneys' fees, costs, and expenses incurred in connection with: (i) THP's *ex parte* application for reconsideration; (ii) the limited portion of the Ninth Circuit appeal addressing the application for reconsideration (as opposed to the appeal of the district court's initial ruling); and (iii) Petitioners' motion for sanctions, including fees incurred in connection with this Special Master proceeding.

2. Pursuant to 28 U.S.C. § 1927, Attorney Donald Hagans should be held jointly and severally liable with Respondent THP for up to 50% of the above amount, not to exceed $123,491.84.

3. Pursuant to 28 U.S.C. § 1927, Attorney Gregory A. Vega should be held jointly and severally liable with Respondent THP for up to 20% of the above amount, not to exceed $49,396.74.

4. Pursuant to 28 U.S.C. § 1927, Attorney Ricardo Arias should be held jointly and severally liable with Respondent THP for up to 10% of the above amount, not to exceed $24,698.37.

The total monetary award is set forth in table form here for the convenience of the panel.

| Party | Amount |
|---|---|
| GTP's Total Recommended Recovery | **$246,983.68** |
| Amount Recoverable from Respondent Tungsten Heavy Powder, Inc. (THP) | $246,983.68 |
| Amount Recoverable from Real Party in Interest Donald Hagans, jointly and severally | $123,491.84 |

| | |
|---|---|
| Amount Recoverable from Real Party in Interest Gregory A. Vega, jointly and severally | $49,396.74 |
| Amount Recoverable from Real Party in Interest Ricardo Arias, jointly and severally | $24,698.37 |

A monetary judgment in these amounts should be entered by the Clerk of Court if the panel adopts this Report and Recommendation.

Second, the Special Master recommends that the panel issue a public reprimand to Attorney Gregory A. Vega pursuant to its power under Fed. R. App. P. 46(c).

Finally, the Special Master recommends to the panel that the following State and Federal Bars should receive from the Clerk of this Court a certified copy of this Report & Recommendation for consideration of any further discipline they deem appropriate.

1. The State Bar of Texas, with respect to Donald Hagans's conduct.

2. The State Bar of California, with respect to Gregory A. Vega and Ricardo Arias's conduct.

3. The U.S. District Court for the Southern District of California, with respect to Gregory A. Vega and Ricardo Arias's conduct.

4. The U.S. District Court for the District of Wyoming, with respect to Megan Overmann Goetz's conduct.

Respectfully submitted,

DATED: October 31, 2023

Richard C. Tallman
Richard C. Tallman
UNITED STATES CIRCUIT JUDGE